FILED
JAMES BONINI
CLERK

09 NOV -6 PM 3: 48

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST DIV. COLUMBUS

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF OHIO

### EASTERN DIVISION

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS LOCAL 697
PENSION FUND, Individually and on Behalf
of All Others Similarly Situated,

                    Plaintiffs,

vs.

LIMITED BRANDS, INC., LESLIE H.
WEXNER, STUART B. BURGDOERFER,
MARTYN R. REDGRAVE, and SHAREN J.
TURNEY,

                    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No.

Judge

**2:09 cv 1008**

**JUDGE SARGUS**

**MAGISTRATE JUDGE ABEL**

## CLASS ACTION COMPLAINT FOR
## VIOLATION OF THE FEDERAL SECURITIES LAWS

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY (0063373)
GEOFFREY J. MOUL (0070663)
BRIAN K. MURPHY, Trial Attorney (0070654)
1533 Lake Shore Drive
Columbus, OH 43204

WHATLEY DRAKE & KALLAS, LLC
JOE R. WHATLEY, JR.
DEBORAH CLARK-WEINTRAUB
PATRICK J. SHEEHAN
1540 Broadway, 37th Floor
New York, NY 10036

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
MARIO ALBA JR.
58 South Service Road, Suite 200
Melville, NY 11747

Plaintiff, by its attorneys, alleges upon knowledge with respect to its own acts, and upon information and belief as to all other matters based upon the investigation made by and through its counsel, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings, news articles, securities analyst reports, press releases and other publicly available information concerning Limited Brands, Inc. ("Limited Brands" or the "Company") as follows:

## Jurisdiction and Venue

1.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

3.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District and Limited Brands maintains its chief executive offices and principal place of business within this District.

4.     In connection with the acts alleged in this complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## Parties

5.     Plaintiff purchased securities issued by Limited Brands during the Class Period, as set forth in the accompanying Certification, and was damaged thereby as a result of Defendants' conduct alleged herein.

6.     Defendant Limited Brands is a Delaware corporation that maintains its executive offices at Three Limited Parkway, P.O. Box, 16000, Columbus, Ohio 43216. Limited Brands is a

- 1 -

specialty retailer of women's intimate and other apparel, beauty and personal care products and accessories under various trade names, including Victoria's Secret. The Company sells merchandise through retail stores, which are primarily mall-based, in the United States and Canada, and through websites and catalogues.

7.      Defendant Leslie H. Wexner ("Wexner") has been Limited Brands' Chairman for more than thirty years and its Chief Executive Officer since the Company was founded in 1963.

8.      Defendant Stuart B. Burgdoerfer ("Burgdoerfer")has been Limited Brands' Chief Financial Officer since April 2007.

9.      Defendant Martyn R. Redgrave ("Redgrave") has been Limited Brands' Executive Vice President and Chief Administrative Officer since March 2005.  In addition, Mr. Redgrave was Limited Brands' Chief Financial Officer from September 2006 to April 2007.  Redgrave also served as a director of n2N Commerce, Inc.

10.     Defendant Sharen J. Turney ("Turney") has been Chief Executive Officer and President of Victoria's Secret Megabrand and Intimate Apparel since July 2006.  Turney also served as a director of n2N Commerce, Inc.

11.     Defendants Wexner, Burgdoerfer, Redgrave and Turney are referred to collectively as the "Individual Defendants."

12.     As set forth and alleged in detail below, during the Class Period, because of their senior executive positions with the Company, the Individual Defendants were directly involved in the day-to-day operations of the Company, at the highest levels, and were privy to confidential and proprietary information concerning the Company.  The Individual Defendants had access to adverse non-public information concerning matters alleged in this Complaint through access to internal corporate documents (including the Company's operating plans, budgets, forecasts and reports of actual operations), communications with other corporate officers and employees, attendance at

management and Board of Directors' meetings and committees thereof, as well as periodic reports and other information provided to them. Except to the extent set forth in this Complaint, Plaintiffs and other members of the Class had no access to such information, which was, and remains, solely under the control of Defendants.

13. As officers and controlling persons of a publicly-held company whose common stock is registered with the SEC pursuant to the Exchange Act, traded on the New York Stock Exchange ("NYSE") and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

14. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements and omissions contained in the communications, and were aware of their materially false and misleading nature. By virtue of their Board memberships and/or executive and managerial positions with Limited Brands, each of the Individual Defendants had access to the adverse, undisclosed information about the Company's business prospects, financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made, or adopted, by Limited Brands materially false and misleading.

- 3 -

15.     The Individual Defendants, because of their positions of control and authority as directors and/or officers with the Company, were able to, and did, control the content of the various SEC filings, and press releases and other public statements pertaining to the Company during the Class Period. With respect to the documents containing alleged misleading statements or omissions, each Individual Defendant was provided with copies of those documents prior to or shortly after their issuance and/or had the ability and/or the opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public reports and releases described herein and is, therefore, individually and primarily liable for the representations they contained.

### Plaintiff's Class Action Allegations

16.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class") consisting of all persons who purchased Limited Brands common stock during the period of August 22, 2007 through February 28, 2008, inclusive (the "Class Period"). Excluded from the Class are Defendants, persons serving as officers and directors of the Company during the relevant time period, members of each of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any of the foregoing have or had a controlling interest.

17.     The members of the Class are so numerous that joinder of all members is impracticable. As of March 21, 2008, Limited Brands had more than 300 million shares of common stock outstanding, which were actively traded on the NYSE. While the exact number of Class members is unknown at the present time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed. Record owners and other members of the Class may be identified from records maintained by Limited Brands or its transfer agent, and members of the class may be notified

of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

18.    Plaintiff's claims are typical to the claims of all members of the Class. All members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein and have incurred substantial damages in connection therewith.

19.    Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are competent and experienced in both class action and securities litigation. Plaintiff has no interests which conflict with those of the Class members they seek to represent.

20.    Common questions of law and fact exist as to all Class members and predominate over any questions that may affect only individual Class members. Among the questions of law and fact common to the Class are:

(a)    whether Defendants' acts, as alleged herein, violated the federal securities laws;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations and financial performance of Limited Brands;

(c)    whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

(d)    whether Defendants participated in and pursued the fraudulent scheme or course of conduct complained of;

(e)    whether Defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts;

(f)     whether the market price of Limited Brands' securities were artificially inflated during the Class Period due to the material misrepresentations and omissions complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

21.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### Substantive Allegations

22.     In 2006, Limited Brands decided to replace the outdated and costly direct-to-consumer infrastructure for the e-commerce business of its subsidiary, Victoria's Secret Direct, LLC ("VSD"), with new technology that would enable VSD to interact with customers in real time through shopping behavior-triggered online merchandising displays and e-mail promotions.

23.     Limited Brands and VSD decided not to develop this new technology in-house. Rather, they chose to have it developed by a joint venture that would be funded by Limited Brands and General Catalyst Partners of Cambridge, Massachusetts.  The joint venture was incorporated as Everest Commerce, Inc., on June 13, 2006, and soon thereafter changed its name to n2N Commerce, Inc. ("n2N").  n2N management was dominated by individuals with connections to Limited Brands and Defendants Redgrave and Turney sat on n2N's board of directors.  n2N's new software was to interact with, *inter alia*, a new one-million square foot warehouse and distribution center that Limited Brands was building for VSD.

24.     On January 31, 2007, n2N issued a press release announcing its launch to deliver the industry's first cross-channel on-demand eCommerce technology platform designed from the ground up to service large multi-channel retailers.  The release stated that VSD would "power its $1.3 billion annual direct-to-consumer business with n2N's on-demand software in the second half of 2007."

25.     On July 23, 2007, n2N issued a press release stating, in relevant part, that "Victoria's Secret Direct will begin to operate its $1.4 billion direct-to-consumer business on n2N's on-demand platform in the second half of 2007."  Defendant Turney was quoted in the release as stating, "[Limited Brands'] decision to embrace the n2N platform was strongly influenced by the promise of ongoing technology innovation. n2N's impressive Platform Innovation Ecosystem is a key element in ensuring a robust infrastructure on which we can grow our business for many years."

26.     On August 22, 2007, Limited Brands issued a press release announcing reported earnings per share for the second quarter ended August 4, 2007.  According to the press release, second quarter earnings were $0.67 compared to $0.28 the previous year, second quarter operating income was $318.9 million compared to $196.8 million in the second quarter of 2006, and net income was $264.4 million compared to $113.1 million in the same quarter the previous year.  The press release Company also stated that was comfortable with First Call consensus earnings per share estimates of $0.04 and $1.18 for the third and fourth quarters of 2007, respectively.  According to the press release, this outlook included the impact of all the previously announced transactions and initiatives and the Company's view of fall business performance.

27.     On August 23, 2007, Limited Brands held its second quarter 2007 earnings conference call.  During the conference call, Defendant Burgdoerfer reiterated the Company's third and fourth quarter earnings guidance contained in the August 22, 2007 press release.  In addition, Defendant Redgrave stated that the Company had "just opened a brand-new distribution center to

support the growth of both the existing Victoria's Secret direct business and the new Bath & Body Works direct business." Defendant Turney stated that although total segment operating income for Victoria's Secret had declined 13% in the second quarter due in part to expenses associated with the new distribution center, "[t]hese investments support the future growth of [Victoria Secret's] direct business." Defendant Turney further stated that:

> [T]he catalog and the Internet channel continues to be an important part of the 360-degree aspect we provide our customers and we maintain momentum through the second quarter in the direct channel. Victoria's Secret [d]irect achieved second quarter sales growth of 9% above expectation. . . . From a marketing basis, we optimized our circulation investment in high performing categories and increased our e-mail circulation in the second quarter. Operating income dollars and margin improved versus last year, and the increase in merchandise margin offset the impact of the  incremental investment to support the growth of our direct business that I mentioned earlier. We are pleased that our new state of the art distribution center opened in August, and that the new 1 million square foot distribution center will support the long-term expansion of the direct channel. The new D.C. has capacity to handle over 40% more volume than our old D.C. We are still in the midst of a controlled start of the new distribution center, while we continue to work through normal implementation issues, we are . . . excited about the expanding capabilities, the new facility will provide us, from an operational perspective.

28.     On October 11, 2007, Limited Brands issued a press release updating its earnings guidance for the third quarter of 2007, stating that the Company expected to report third quarter earnings per share between $0.00 and $0.04 versus its previous guidance of $0.04 per share. That same day, in a pre-recorded message regarding September sales, Amie Preston ("Preston"), Vice President of Limited Brands' Investor Relations, stated that VSD had "transitioned to a new distribution center in August and [had] experienced delays in ship times in August and into September." However, the message reassured listeners that VSD had "made significant progress in September," that "sales were up 27% to last year," and that "[t]he distribution center [was] now operating under normal ship times and [Limited Brands was] targeting to offer the full range of shipping options including one day by the end of October."

29.     In an interview reported in the October 2007 edition of Apparel Magazine, Defendant Turney indicated that she expected that the n2N system would allow Limited Brands to double its direct sales business in the next five years, stating: "Overall, we're very excited about the implementation. It's going to add a lot of value to our business. We're very dedicated to it. We've got a lot of people focused on it, and I think it is going to set us up for growth for the future." Turney also stated that testing performed on the n2N system revealed "the normal glitches, but nothing major."

30.     On November 8, 2007, Limited Brands issued a press release reporting October sales. In a pre-recorded message available the same day, Preston, reiterated that VSD had "transitioned to a new distribution center in early August and [had] experienced delays in ship times." While August sales were down 64%, Preston reaffirmed that September sales were up 27% as [VSD] cleared through some of the August backlog. . . ." Preston also stated that VSD's "progress in ramping up capacity at the DC ha[d] been slower than expected," and that "[a]lthough demand remains very strong, [VSD] want[ed] to insure that [it did not] disappoint [its] customers." As a result, Preston disclosed that VSD had "taken actions, including reducing catalog circulation which [would] significantly reduce fourth-quarter demand and sales."

31.     In response to the partial disclosures concerning the impact of the difficulties with the new distribution center and its impact on sales, the price of Limited Brands common stock fell from $21.44 on November 7, 2007 to $19.70 on November 20, 2007 on heavy volume.

32.     On November 20, 2007, Limited Brands issued a press release reporting its earnings for the third quarter of 2007. According to the release, reported earnings per share for the third quarter ended November 3, 2007, were $0.03 compared to $0.06 the prior year. Third quarter operating income was $61.1 million compared to $66.5 million the previous year, and net income was $12.1 million compared to $23.5 million in 2006. With respect to the fourth quarter, the release

stated that the company expected fourth quarter earnings per share of $0.90 to $1.05 versus $1.08 in

2006. According to the release, the decline versus previous guidance reflected issues related to the

opening of a new distribution center for Victoria's Secret Direct as well as a challenging overall

retail environment.

33.     In a conference call with analysts the same day, Defendants commented on the

decreased earnings guidance for the fourth quarter as follows.  Defendant Burgdoerfer stated, in

pertinent part:

> The decline versus our previous estimate is primarily attributable to a reduction in
> our projections for Victoria's Secret Direct. . . .  [W]e have taken steps to reduce
> demand and sales in the fourth quarter in order to protect the customer experience.
> We believe that these measures could reduce Victoria's Secret Direct sales in the
> fourth quarter by roughly $150 million versus last year.  We are also incurring
> additional expenses related to the distribution center.

34.     Defendant Redgrave stated in pertinent part:

> As you know, we opened the new distribution center for Victoria's Secret Direct in
> early August.  As we described in our October sales call, it has taken us longer than
> we had anticipated to ramp up this new DC to full capacity.  This has had a negative
> impact on our third quarter results, and we now expect that it will have an even more
> negative impact on our fourth quarter results. . . .
>
> The former distribution center was built back in 1992 when the business was doing
> less than $400 million in volume.  The business is now $1.4 billion, and we have
> been experiencing capacity issues in the last two holiday seasons.  As a result, we
> recognize that we could not support the growth of the direct business with the
> existing DC.  When we planned the new DC that would support the growth of or
> direct business for the next decade, we invested in a new physical facility, systems,
> material handling equipment and processes, that represent the best practices that are
> being used in direct distribution.
>
> While many of the systems and processes we are using in the new DC have been
> employed before in other centers, the way in which these systems are integrated is a
> unique combination, due to the high unit velocity and the range of SKU diversity in
> our direct business.  The fact is that the hard change over the new integrated
> processes, mechanical equipment, and IT systems is taking us longer than expected
> to stabilize.  We appear to have hit a limit on how much we can process through the
> new center and we need to be able to substantially increase our throughput to serve
> the volumes that we expect for holiday and January's semi annual sale.
>
> Direct demand at Victoria's Secret remains very strong and we want to ensure that
> we don't disappoint our customers.  Therefore we have taken actions to constrain the

volume of orders we will take, including reducing catalog circulation, which will significantly reduce fourth quarter direct demand and sales. Now, getting the DC up to full capacity is without question the most significant operational priority that we have. We have our best internal people, as well as outside vendor experts and independent experts evaluating the situation, and we are looking at a range of options to make changes.

Although . . . we will be negatively impacted by the issues at the Victoria's Secret [D]irect distribution center, we do believe that our brands are very strong and that we are very well positioned with respect to our assortment, our inventory levels and expense discipline.

35.     Defendant Turney stated in pertinent part:

Total segment operating income [for Victoria's Secret] declined $52 million to $77.7 million, a decline of 40%. The total segment operating income decline was primarily driven by decline at Direct.

\*     \*     \*

[O]ur results at Direct were negatively impacted by the delays in shipping out of our new distribution center. Demand for the brand, as evidenced by our orders from the catalog and the Internet channel, remain very strong, but sales at Direct declined 7% in the quarter, due to the increased ship times and operating income decline[d] significantly. The decline in operating income was a result of sales and related shipping and handling revenue decline. The loss of higher margin, expedited shipping options and incremental labor hired to staff the DC and work on fixing the issue. We are obviously disappointed that we've had to take steps to reduce this demand in the fourth quarter. However, protecting the customer experience and her satisfaction with the brand is of paramount importance. As Martyn [Redgrave] said, this is our most significant operational priority and we are working very hard to bring the DC up to full capacity and maintain customer satisfaction.

36.     In response to a question from Lehman Brothers analyst Jeff Black as to whether the

issues with the distribution center would extend beyond the fourth quarter of 2007 and continue into

the Spring of 2008, Defendant Redgrave stated that:

[I]n opening the center in August, we had expected a slow ramp up. We did in fact ramp up at about the pace that we were expecting to ramp up at, to about the end of September and into October. We saw noise, if you will, in the operation of the center, but we didn't see an inability to break through the volume levels that we need to break through to service holiday.

Over the last four weeks, as we've evaluated the performance of the center, we've concluded that there are some issues there that are going to cause us to have to limit the capacity of the center – that will limit the capacity of the center as we enter into holiday.

- 11 -

*       *       *

Another point that I would give you as perspective is that the center right now is operating at about 70 to 75% of our targeted capacity. In other words, the capacity we would need to be at to fully service holidays. So that gives you a sense of the gap. . . . [W]e are obviously focused on stabilizing the systems, the processes, and the, and ensuring that our people are properly trained to operate these new systems and processes. We're working on all aspects of that on a very realtime basis with internal and outside experts, and at this stage, it's premature to say how long it's going to take to fully stabilize the center and whether or not it's going to have an impact on the spring. We do expect it to have some impact, though.

37.    In response to a follow-up question from Jeff Black inquiring whether operating at

70% of capacity the system could handle spring volume, Redgrave responded, that it could.

38.    On December 6, 2007, Limited Brands issued a press release reporting November

sales. That same day, in a pre-recorded message concerning VSD Preston, Preston reported the

following:

[S]ales on a fiscal basis were up 7% to last year due to the extra pre-holiday week versus last year. On a calendar basis, sales were down 6% to last year.

As we said on our third-quarter earnings call two weeks ago, we are experiencing operational challenges in the new direct distribution center and have taken actions to significantly reduce fourth-quarter sales in order to protect the customer experience.

There have not been any significant changes in the status of the DC since our earnings call. We continue to focus on maximizing the throughput of the DC for the holiday time period while at the same time evaluating solutions.

39.    On January 10, 2008, Limited Brands issued a press release reporting December 2007

sales and updating its earnings guidance. The release stated that although there was still a month left

in the fourth quarter, as a result of an 8 percent decline in comparable store sales quarter-to-date

versus the Company's previous expectation of a low single digit decline, the Company now expected

to report fourth quarter earnings per share at the low-to-mid point of the previously announced range

of $0.90 to $1.05. That same day, in a pre-recorded message concerning VSD, Preston reported the

following:

Turning to Victoria's Secret Direct, sales on a fiscal basis were down 11% to last year due primarily to one less preholiday week versus last year. On a calendar basis

sales were down 9% against 10% growth last year. Quarter to date sales at Direct are down 5% on a fiscal basis. We made significant progress with DC output in December and were able to achieve daily output that surpassed our initial expectation. As a result, we were able to take some actions to regenerate demand, including reactivating a free shipping offer for the semi-annual sale and increasing our email contacts. We have a thorough understanding of the issues at the DC, and we are working to implement the solution.

40.     On February 27, 2008, Limited Brands issued a press release reporting fourth quarter and full year 2007 earnings. According to the release, earnings per share for the 13-week fourth quarter ended February 2, 2008, were $1.10 compared to $1.08 for the 14 weeks ended February 3, 2007; fourth quarter operating income was $621.4 million compared to $726.8 million the prior year; and net income was $388.6 million compared to $439.8 million in 2006. Excluding the impact of extraordinary items, fourth quarter earnings per share were $0.94 compared to $1.08 the prior year; operating income was $573.6 million compared to $726.8 million in 2006; and net income was $331.7 million compared to $439.8 million the previous year. Earnings per share for the 52-week year ended February 2, 2008, were $1.89 compared to $1.68 for the 53 weeks ended February 3, 2007. Operating income was $1.110 billion compared to $1.176 billion the prior year, and net income was $718.0 million compared to $675.0 million for 2006. Excluding the impact of extraordinary items, earnings per share for the 52-week year ended February 2, 2008 were $1.21 compared to $1.68 for the 53 weeks ended February 3, 2007. Operating income was $861.0 million compared to $1.176 billion the prior year, and net income was $461.8 million compared to $675.0 million for 2006.

41.     The February 27, 2008 press release also significantly lowered the Company's previously issued guidance for 2008. The press release stated that the Company now expected February comps in the negative low double digit range versus its previous guidance for negative mid to high single digit comps, and it expected 2008 first quarter earnings per share to be $0.05 to $0.10

compared to $0.13 per share the prior year. The release stated that for 2008, the Company expected earnings per share of $1.35 to $1.55.

42.     In a conference call with securities analysts at 9:00 a.m. on February 28, 2008, Defendants discussed the disappointing earnings results reported after the market close the previous day. Defendant Redgrave stated:

> As we look back in 2007, we are clearly disappointed with our financial performance.
>
> [I]t did take us longer than expected to get the new direct distribution center up to capacity. This resulted in a significant incremental cost in the second half of the year and forced us to proactively take steps to reduce demand in the fourth quarter.
>
> [W]ith respect to the direct distribution center, we continue to make progress and we are focusing on two key things. Our primary focus is on the things that face the customer including being able to fully meet the volume demands at our targeted accuracy levels and offering all expedited shipping options. We are targeting to have all of these issues resolved by the June semi annual sale this year. At the same time, we are focusing on improving our overall efficiency and productivity within the DC. In relation to this effort, we do think it will take a longer period of time before we are completely where we need to be. As a result, in 2008, we will continue to be negatively impacted by higher costs associated with lower accuracy levels running the DC and implementing the solutions.
>
> In addition, in the fourth quarter we and our investment partner in the front end technology venture for Victoria's Secret Direct elected not to provide additional funding and that venture has closed. We are currently evaluating alternative approaches to support the VSD business.

43.     In response to the partial disclosures concerning the impact of the difficulties with the new distribution center and its impact on sales, the price of Limited Brands common stock fell from $17.82 on February 27, 2008 to $15.85 on February 28, 2008 on heavy trading volume.

44.     Defendants' statements set forth in ¶¶ 24-30 and 32-42 above were materially false and misleading because they misrepresented and/or failed to disclose adverse events surrounding the development of the new VSD warehouse and n2N technology and their likely adverse impact on VSD's and Limited Brands financial results long before Defendants began publicly disclosing this information in a slow trickle beginning in early November 2007. Among other things, as early as the

- 14 -

Spring and Summer of 2007: (a) there were delays in providing the specifications necessary to build the software being developed by n2N; (b) critical personnel involved with n2N in designing the n2N software left Limited Brands in the early stages of the software's development; and (c) the Information Technology departments of Limited Brands and VSD were in a state of chaos and VSD's highly touted automated distribution center was beset with difficulties. Indeed, as early as the summer of 2007, a memorandum was circulating internally within Limited Brands regarding its "Direct to Consumer Initiative" which described "Limited Brands leadership" as believing that a "significant change in approach" was necessary because "[t]he current working relationship between Limited Brands and n2N is not efficient or effective for delivering a solution that can be implemented in Limited Brands within an acceptable time frame and budget."

**Additional Scienter Allegations**

45.     As alleged herein, Defendants acted with scienter in that each Defendant knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company, as set forth herein, were materially false and misleading when made. Defendants knew that such statements or documents would be issued or disseminated to the investing public and they knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Limited Brands, its business and finances, their control over Limited Brands' allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning Limited Brands, were active and culpable participants in the fraudulent scheme alleged herein.

46.     At all relevant times, Defendants had actual knowledge of, or recklessly disregarded, the true facts concerning Limited Brands' business and financial performance as particularized

- 15 -

above.  Nevertheless, Defendants issued the materially false and misleading statements identified above, which were contradicted by internal evidence that was known to or recklessly disregarded by Defendants during the Class Period.

### Loss Causation/Economic Loss

47.     The market for Limited Brands' common stock was open, well-developed and efficient at all relevant times.  As a result of the materially false and misleading statements and failures to disclose described above, Limited Brands' common stock traded at artificially inflated prices during the Class Period.  Had the true facts been disclosed, Limited Brands' stock price would have decreased substantially.  Investors who purchased Limited Brands' stock at these fraud-inflated prices were damaged by paying too much as reflected in the price declines of Limited Brands' stock following the adverse disclosures detailed above.

48.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Limited Brands common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  The identified statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as detailed herein.

49.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Limited Brands' financial condition.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Limited Brands and its business, financial condition, prospects and operations, thus causing the Company's

common stock to be overvalued and its price artificially inflated at all relevant times. Defendants'
materially false and misleading statements during the Class Period resulted in Plaintiff and other
members of the Class purchasing the Company's common stock at artificially inflated prices, thus
leading to its losses when the deception was revealed, and the market was able to accurately value
the Company's shares.

### Applicability Of Presumption of Reliance:
### Fraud – on – the – Market Doctrine

50.     Plaintiff relies, in part, on the presumption of reliance established by the fraud-on-the-
market presumption.

51.     At all relevant times, the market for Limited Brands' common stock was an efficient
market for the following reasons, among others:

(a)     Limited Brands' stock met the requirements for listing, and was listed and
actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer, Limited Brands filed periodic public reports with the
SEC and the NYSE that contained material misrepresentations and/or omitted material facts during
the Class Period as alleged herein, causing Limited Brands stock to trade at artificially inflated
prices;

(c)     Limited Brands regularly communicated with public investors *via* established
market communication mechanisms, including through regular disseminations of press releases on
the national circuits of major newswire services and through other wide-ranging public disclosures,
such as communications with the financial press and other similar reporting services;

(d)     Limited Brands was followed by several securities analysts employed by
major brokerage firm(s), who wrote reports that were distributed to the sales force and certain
customers of their respective brokerage firm(s). Each of these reports was publicly available and

entered the public marketplace. In writing these reports, analysts reflected information provided by Defendants; and

(e)     the trading volume of Limited Brands common stock was substantial during the Class Period, indicating that there was a liquid market for Limited Brands common stock during the Class Period.

52.     As a result of the foregoing, the market for Limited Brands securities promptly digested current information regarding Limited Brands from all publicly available sources and reflected such information in Limited Brands' stock price. Under these circumstances, all purchasers of Limited Brands common stock during the Class Period are entitled to a presumption of reliance because they all suffered similar injury through their purchase of Limited Brands' common stock at artificially inflated prices.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

53.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is asserted against all Defendants.

54.     During the Class Period, Limited Brands and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Limited Brands' common stock; and (c) cause Plaintiff and other members of the Class to purchase Limited Brands' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, individually took the actions set forth herein.

55.     Defendants, either individually or as a group: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts

necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Limited Brands' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and the Individual Defendants are also sued herein as controlling persons of Limited Brands as alleged below.

56.     In addition to the duties of full disclosure imposed on Defendants as a result of their dissemination of affirmative statements, or participation in the making of affirmative statements to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X [17 C.F.R. §§210.01 *et seq.*] and SEC Regulation S-K [17 C.F.R. §§229.10 *et seq.*] and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market price of the Company's common stock would be based on truthful, complete and accurate information.

57.     Defendants, individually and as a group, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Limited Brands as specified herein.

58.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Limited Brands' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about Limited Brands and its business operations and future prospects, in the

light of the circumstances under which they were made, not misleading as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Limited Brands' common stock during the Class Period.

59.     Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (a) he or she was a director and/or high-level executive at the Company during the Class Period and a member of the Company's management team; (b) by virtue of his or her responsibilities and activities as a senior officer of the Company, he or she was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans and projections and/or reports; (c) he or she enjoyed significant personal contact and familiarity with the other Defendants and was advised of or had access to other members of the Company's management team, internal reports and other data and information about the Company's business finances and operations at all relevant times; and (d) he or she was aware of the Company's dissemination of information to the investing public, which he or she knew or recklessly disregarded, was materially false and misleading.

60.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Defendants' material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing Limited Brands' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. If Defendants did not have actual knowledge of the misrepresentations and omissions alleged, they were at the very least reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

61.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Limited Brands' securities was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of Limited Brands' securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Limited Brands securities during the Class Period at artificially inflated prices based on their reliance.

62.     As alleged herein, the market prices of Limited Brands' securities declined materially when the truth concerning Limited Brands' financial prospects and business, which had been concealed by Defendants' material misrepresentations and omissions, was disclosed, causing Plaintiff and the other members of the Class substantial damages.

63.     At the times, Defendants disseminated the misrepresentations and omissions complained of herein, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Limited Brands, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Limited Brands' shares, or, if they had acquired such shares during the Class Period, they would not have purchased them at the artificially inflated prices which they paid.

64.     By virtue of the forgoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of the
### Exchange Act Against the Individual Defendants

65.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against the Individual Defendants.

66.     The Individual Defendants were and acted as controlling persons of Limited Brands within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with Limited Brands, their ownership and contractual rights, their participation in and/or awareness of the Company's operations, and/or their intimate knowledge of the Company's actual performance and undisclosed problems, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

67.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised same.

68.     As set forth above, Limited Brands violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Limited Brands, the Individual Defendants are liable to Plaintiff and the other members of the Class pursuant to Section 20(a).  As a direct and proximate result of Defendants' wrongful conduct,

Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

A.      Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

### Jury Trial Demanded

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:  November 6, 2009       MURRAY MURPHY MOUL + BASIL LLP


_____
BRIAN K. MURPHY (0070654)

JOSEPH F. MURRAY (0063373)
GEOFFREY J. MOUL (0070663)
BRIAN K. MURPHY, Trial Attorney (0070654)
1533 Lake Shore Drive
Columbus, OH  43204
Telephone:  614/488-0400
614/488-0401 (fax)
E-mail:  murphy@mmmb.com

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
MARIO ALBA JR.
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
E-mail:  srudman@csgrr.com

WHATLEY DRAKE & KALLAS, LLC
JOE R. WHATLEY, JR.
jwhatley@wdklaw.com
DEBORAH CLARK-WEINTRAUB
dweintraub@wdklaw.com
PATRICK J. SHEEHAN
psheehan@wdklaw.com
1540 Broadway, 37th Floor
New York, NY 10036
Telephone:  212/447-7070
212/447-7077 (fax)

CAVANAGH & O'HARA
PATRICK J. O'HARA
407 East Adams Street
Springfield, IL  62701
Telephone:  217/544-1771
217/544-9894 (fax)

*Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 697 PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*Query v. Maxim Integrated Products, Inc., et al.,* No. C-08-00852-PVT (N.D. Cal.)
*International Brotherhood of Electrical Workers Local 697 Pension Fund v International Game Technology, et al.,* No. 3:09-cv-00419-ECR-RAM (D. Nev.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this <u>5th</u> day of <u>November</u>, 2009.

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS LOCAL 697
PENSION FUND

By: _____

Its:    Fund Manager

- 2 -

LIMITED BRANDS

SCHEDULE A

SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 10/15/2007 | 4,700 | $22.26 |

Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 12/07/2007 | 1,400 | $20.51 |

*Opening position of 15,400 shares.