UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 697 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | No. 2:09-cv-01008-EAS-MRA |
| | ) | Judge Sargus |
| Plaintiff, | ) ) | Magistrate Judge Abel |
| | ) | |
| vs. | ) ) | |
| LIMITED BRANDS, INC., et al., | ) ) | |
| Defendants. | ) ) | |
| | ) | |

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY (0063373)
GEOFFREY J. MOUL (0070663)
BRIAN K. MURPHY (0070654)
326 S. High Street, Suite 400
Columbus, OH 43215

Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
HENRY ROSEN
655 West Broadway, Suite 1900
San Diego, CA 92101
    – and –
SARAH R. HOLLOWAY
100 Pine Street, Suite 2600
San Francisco, CA 94111

Lead Counsel for Plaintiff

## INTRODUCTION

1. This is a securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of Limited Brands, Inc. ("Limited Brands" or the "Company") between August 22, 2007 and February 28, 2008, inclusive (the "Class Period"), against Limited Brands, its Chief Executive Officer ("CEO") Leslie H. Wexner ("Wexner"), its Chief Financial Officer ("CFO") Stuart B. Burgdoerfer ("Burgdoerfer"), its Executive Vice President and Chief Administration Officer ("CAO") Martyn R. Redgrave ("Redgrave"), and CEO and President of Victoria's Secret Megabrand and Intimate Apparel, a Limited Brands subsidiary, Sharen J. Turney ("Turney"), for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2. Limited Brands is a specialty retailer of women's intimate and other apparel, beauty and personal care products and accessories under various trade names, including Victoria's Secret and Bath & Body Works. The Company sells its merchandise through retail stores, websites and catalogues.

3. Prior to the Class Period, Limited Brands was involved in an ongoing project to upgrade and modernize its various information technology ("IT") systems. As part of this initiative, Limited Brands was planning to develop new "front-end" technology for its subsidiary Victoria's Secret Direct, LLC ("VSD") to replace VSD's outdated mainframe operating system. VSD handles the online and catalogue orders for Victoria's Secret Megabrand. Rather than develop the new technology in-house, Limited Brands, along with private equity firm General Catalyst Partners ("General Catalyst"), funded a new venture, n2N Commerce, Inc. ("n2N"), in 2006 to develop the new system for VSD. According to a July 23, 2007 n2N press release, VSD planned to "operate its $1.4 billion direct-to-consumer business on n2N's on-demand platform in the second half of 2007."

4. At the same time, Limited Brands was also building a new distribution center ("DC") for VSD. The DC project involved a new, large distribution warehouse, new conveyor system and

new Enterprise Resource Planning ("ERP") system to interact with the new n2N software and fulfill and ship VSD orders on the "back-end." Limited Brands and VSD planned to implement the new DC in August 2007.

5.     Throughout 2007, defendants touted the new DC and n2N projects as "key strategic imperatives" that would drive the Company's and VSD's growth. For example, prior to the Class Period, defendants told investors that "[o]nly n2N [could] address [VSD's] requirements" and that n2N's software would "drive down operating costs" and "reshape the retail industry." In addition, defendants told investors that Limited Brands' investments in the n2N technology and new DC would "support the growth" of VSD and "deliver future positive returns."

6.     By August 22, 2007, the start of the Class Period, defendants knew that neither the n2N project nor the new DC would support VSD's growth as they had led investors to believe. Nonetheless, on August 23, 2007, defendants continued to tout the new DC as an investment that would "support the future growth of [VSD's] business." Defendants also told investors that "[t]he new D.C. ha[d] capacity to handle ***over 40% more volume*** than [the] old D.C." and was experiencing only "***normal implementation issues***."

7.     Defendants' statements regarding the new DC were false or misleading, as they failed to disclose significant problems known to defendants that were affecting the DC. By its implementation in August 2007, defendants knew, through various daily internal reports, that the DC was experiencing significant operational problems, resulting in numerous shipping and capacity issues. According to percipient witnesses, the DC's systems were significantly more complex than the old systems and required substantial training to operate properly. Limited Brands, however, failed to adequately train the DC staff prior to its August 2007 implementation. As a result, DC floor workers had difficulty operating the new systems, resulting in numerous problems with its operations, conveyor systems, order fulfillment and shipping. In addition, the new DC software was

- 2 -

plagued with "bugs" and required ongoing customizations to improve its functionality, further hindering its operations. These problems were so substantial that from August 2007 to February 2008, Limited Brands employed a special team tasked specifically with fixing the DC's pervasive problems.

8.     Despite these problems, defendants continued to make false or misleading statements and material omissions about the DC. On September 6, 2007, defendants told investors that while the DC had experienced some "delays" in shipment times, resulting in decreased VSD sales, the DC would "be operating under normal ship times by the end of September [2007]." Defendants reaffirmed this statement on October 11, 2007, stating that the DC was "now operating under normal ship times." The DC, however, was *not* "operating under normal ship times." According to percipient witnesses, the DC continued to experience significant software glitches and functional problems throughout 2007 and into 2008. Moreover, Limited Brands still had not properly trained its DC workers prior to the 2007 holiday season – the Company's busiest season. As a result, the DC continued to experience operational problems resulting in shipments to many customers of the wrong products, the wrong quantities or no items at all. These problems significantly inhibited the shipment and flow of merchandise during the Company's most profitable season, thereby exacerbating the negative impact on Limited Brands' results. Indeed, defendants later admitted that the DC's capacity and operational problems cost the Company approximately *$80 million* in the Fall 2007.

9.     Despite defendants' positive statements, the DC's problems continued to negatively affect the Company. Unable to fully conceal these problems, given their material impact on the Company's 3Q07 reported financial results, defendants began to trickle information about the true nature of the DC's problems into the marketplace in November 2007. Defendants disclosed that it had "taken [them] longer than [they] had anticipated to ramp up this new DC to full capacity" and, as

- 3 -

a result, they were taking actions to reduce 4Q07 demand. Defendants, however, assured investors that they had "***expected*** a slow ramp up," and that demand at VSD "***remain[ed] very strong***." Further, defendants avowed that the DC was Limited Brands' "most significant operational priority" and that, in any event, it could "handle spring volume" in 2008.

10.    Defendants statements were, at best, misleading, as the DC's problems continued to materially affect the Company well into 2008. Finally, on February 28, 2008, defendants disclosed the extent of these problems and admitted that the DC's issues would not be resolved until ***June 2008***. As a result of these disclosures, Limited Brands' stock price fell ***nearly 15%*** to close at $14.66 on February 29, 2008.

11.    In addition to the DC, defendants also made false or misleading statements and material omissions about the n2N project during the Class Period. For example, in an October 2007 edition of Apparel Magazine, defendant Turney stated that the n2N software would allow Limited Brands to "***double***" its direct sales business in the next five years and would "add a lot of value to our business." In addition, when asked about any implementation challenges, Turney stated that Limited Brands and n2N had encountered only "'***the normal glitches, but nothing major***.'" To the contrary, however, the n2N project had significant "glitches" and was not proceeding as defendants led investors to believe. From the project's inception, Limited Brands had insisted on features and functions beyond the scope of the original plan and failed to provide timely specifications and documents to n2N for proper implementation of the project. In addition, throughout the Class Period, VSD and n2N internal reports identified thousands of "issues" hindering the software's functionality. These issues prevented n2N from meeting its April 2007 milestones and receiving additional funding necessary for its survival. Further, numerous witnesses have reported that ***all*** of n2N's demonstrations of its software, beginning in June 2007, showed that the product was not functional and failed to meet the Company's specifications.

- 4 -

12.     Despite Turney's positive statements, by August 2007, the start of the Class Period, Limited Brands had already decided to abandon n2N.  According to a February 2008 complaint drafted by General Catalyst (the "GC Complaint"), attached hereto as Exhibit A, and an October 31, 2008 demand letter from the Assignee for the Benefit of Creditors of n2N to Limited Brands (the "Demand Letter"), attached hereto as Exhibit B, by August 2007, high-level executives at Limited Brands wanted to "shut down" n2N.  Other witnesses reported that Limited Brands' management first considered terminating the project – due to its failing functionality tests – as early as late 2006. In addition, according to the GC Complaint, defendants admitted in a September 2007 internal memorandum that "'[t]he current working relationship between Limited Brands and n2N [was] not efficient or effective for delivering a solution that [could] be implemented in Limited Brands within an acceptable time frame and budget.'"  Hence, contrary to experiencing only "'the normal glitches, but nothing major,'" defendants knew that the n2N project was fast approaching failure.  Defendants, however, failed to correct their pre-Class Period statements and affirmatively misled investors to believe that the project was on track and would support VSD's future growth.  Ultimately, Limited Brands completely abandoned the project in December 2007, having never received a functioning product.  As a result of the disclosure of n2N's failure on January 2 and 3, 2008, Limited Brands' stock price fell *over 18%*, to close at $15.08 on January 9, 2008.

13.     As a result of the DC and n2N projects' numerous problems and early failures, defendants repeated reassurances throughout the Class Period regarding the projects' success were false or misleading, and their August 22, 2007 3Q07 and 4Q07 earnings per share ("EPS") guidance, which, according to defendants, was based on these projects' ability to support the Company's growth, had no reasonable basis.

- 5 -

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act [15 U.S.C. §78a].

16.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District and Limited Brands maintains its chief executive offices and principal place of business within this District.

17.     In connection with the acts alleged in this complaint, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

18.     Lead Plaintiff Plumbers and Pipefitters Locals 502 & 633 Pension Trust Fund, as set forth in the accompanying certification, attached hereto as Exhibit C, purchased the securities of Limited Brands at artificially inflated prices during the Class Period and has been damaged thereby as a result of defendants' conduct alleged herein.

19.     Defendant Limited Brands is a Delaware corporation that maintains its executive offices at Three Limited Parkway, Columbus, Ohio 43230. Limited Brands is a specialty retailer of women's intimate and other apparel, beauty and personal care products and accessories under various trade names, including Victoria's Secret and Bath & Body Works. The Company sells its merchandise through retail stores, which are primarily mall-based, in the United States and Canada,

and through websites and catalogues.  Through its wholly-owned subsidiary, L.B.I. Holdings, Inc., Limited Brands owned 39.48% of the voting stock of n2N during the Class Period.

20.     Defendant Wexner is and has been Limited Brands' Chairman of the Board of Directors for more than 30 years and its CEO since the Company was founded in 1963.  During the Class Period, Wexner owned approximately 12.8% of Limited Brands' outstanding common stock.

21.     Defendant Burgdoerfer is and has been Limited Brands' CFO since April 2007.

22.     Defendant Redgrave is and has been Limited Brands' Executive Vice President and CAO since March 2005, reporting directly to defendant Wexner.  Redgrave was Limited Brands' CFO from September 2006 to April 2007.  Redgrave also served as a director of n2N from approximately June 2006 to January 2008.

23.     Defendant Turney is and has been CEO and President of Victoria's Secret Megabrand and Intimate Apparel since July 2006.  Turney also served as a director of n2N from approximately June 2006 to January 2008.

24.     Defendants Wexner, Burgdoerfer, Redgrave and Turney are referred to, collectively, as the "Individual Defendants."

25.     As set forth and alleged in detail below, during the Class Period, because of their senior executive positions with the Company, the Individual Defendants were directly involved in the day-to-day operations of the Company, at the highest levels, and were privy to confidential and proprietary information concerning the Company.  As senior executives of Limited Brands, the Individual Defendants had access to adverse non-public information concerning matters alleged in this complaint through access to internal corporate documents (including the Company's operating plans, budgets, forecasts and reports of actual operations), communications with other corporate officers and employees, attendance at management and Board of Directors' meetings of Limited Brands and n2N, and committees thereof, as well as periodic reports and other information provided

to them.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.  Except to the extent set forth in this complaint, plaintiff and other members of the Class had no access to such information, which was, and remains, solely under defendants' control.

26.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.   In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Limited Brand's business.

27.     As officers and controlling persons of a publicly-held company whose common stock is registered with the SEC pursuant to the Exchange Act, traded on the New York Stock Exchange ("NYSE") and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based on truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

28.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements and omissions contained in

- 8 -

the communications, and were aware of their materially false and misleading nature.  Because of their positions with the Company, the Individual Defendants controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  The Individual Defendants also made the statements alleged herein to be false and misleading, or were present at the time the statements were made, and had the opportunity and ability to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein, and each Individual Defendant is responsible for the accuracy of the public reports and releases described herein and is, therefore, individually and primarily liable for the representations they contained.

29.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Limited Brands common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Limited Brands' business, DC and technology initiatives and the intrinsic value of Limited Brands common stock; and (ii) caused plaintiff and members of the Class to purchase Limited Brands common stock at artificially inflated prices.

**CONFIDENTIAL WITNESSES**

30.     The allegations herein are supported by first-hand accounts of confidential witnesses ("CWs").  These witnesses are comprised of former employees of Limited Brands and/or its subsidiaries employed during the Class Period and/or with knowledge of the events alleged herein.

The CWs provided facts from different departmental and geographic vantage points within the Company.

31.     CW1 was an Associate Merchandise Planner at VSD from May 2007 to February 2008.  As a Merchandise Planner, CW1 worked on schedules for procuring volumes of inventories for each product sold by VSD for the DC.  Because of his[1] familiarity with inventory issues, in November 2007, CW1 was asked to join a special team assembled in the DC tasked with fixing the numerous problems that were inhibiting the flow of merchandise ordered by online and catalogue customers.  CW1 worked on this special project as a Financial Analyst performing work on DC inventory issues from November 2007 until February 2008.  In addition, CW1 prepared daily reports, including Dashboard Reports and Loose Piece Reports, that tracked shipping and operational problems in the DC.  Thus, CW1 was in a position to know the facts attributed to him throughout this complaint and is sufficiently reliable.

32.     CW2 was a Business Relation Executive (an IT position) in the Victoria's Secret Stores Retail Division from October 2005 to March 2009.  In this position, CW2 managed the technology and cross-functional business requests for projects related to Victoria's Secret's growth plan.  CW2 was responsible for over 25 projects related to the integration of "enterprise initiatives" as part of a larger upgrade of Limited Brands' business systems.  Specifically, CW2 was involved in merchandise planning and allocation for Bath & Body Works and was responsible for integrating software upgrades and rolling out new systems across this organization as part of Limited Brands' Insight project.  Pursuant to these responsibilities, CW2 had direct contact with persons working on

---

[1]     The use of the words "he," "his" and "him" in connection with CWs is not meant to be gender specific and shall also be meant to pertain to the female gender.

IT for the new DC.  Thus, CW2 was in a position to know the facts attributed to him throughout this complaint and is sufficiently reliable.

33.     CW3 was a Director of Technology at VSD from 2000 to May 2009.  In this position, CW3 was responsible for the integration of the n2N system with Limited Brands and for building, installing and implementing the interface and processing large volumes of data interchanged between Limited Brands and n2N.  CW3 described the n2N program as very large, involving hundreds of Limited Brand employees along with 20 or 30 n2N employees.  According to CW3, the n2N system was intended to capture orders through the "front-end" and deliver those to the order processing system, which ran in the VSD mainframe and routed orders to the correct location.  The n2N order capturing system was to operate via multiple channels, capturing orders from the VSD website, phone orders to the VSD call center, and orders that were emailed or faxed.  Once distributed to the mainframe, the order processing system sent payment and financial data to Limited Brands' Finance Department for financial processing, then transmitted the orders to the DC to be fulfilled.  Thus, CW3 was in a position to know the facts attributed to him throughout this complaint and is sufficiently reliable.

34.     CW4 held various high-level IT jobs at Limited Brands.  CW4 was a Director of Store Systems/Enterprise Technology Operations from 2001 to 2003; a Director of Resource Planning and Allocation from 2003 to 2005; a Program Director for Technology Services from 2005 to August 2007; and a Director of Technology Delivery at VSD from August 2007 to November 2008.  As Director of Technology Delivery, CW4 headed a 30-member team that worked on upgrading the VSD website as part of the new n2N platform.  This overall program, called "Direct to Consumer" or "DTC," also included VSD's new DC.  CW4 reported to the Senior Vice President of Victoria's Secret IT, Donna Ruch ("Ruch"), who reported directly to defendants Redgrave and Turney.  Both CW4 and Ruch, along with other VSD management, attended weekly DC status

meetings prior to and during the Class Period.  According to CW4, after the DC's implementation in August 2007, "nothing went as planned," as the new system proved difficult for the DC floor workers to use.  Ongoing work performed on the new system, including software "fixes" and ongoing software customization, was discussed at the weekly status meetings.  Such discussions also included operational topics, such as floor workers' confusion over how to handle lost orders on the conveyor system, misplaced inventory, conflicting information on handheld units, and other discrete operational issues.  CW4 reported that the DC's numerous unresolved software "bugs" and customizations were largely responsible for confusion and delays on the DC floor.

35.     CW4 also attended daily n2N meetings during the Class Period.  According to CW4, after joining the n2N project in August 2007, it was immediately clear that the system was "not going to work."  CW4 reported that daily "issues lists" in spreadsheet format identified *thousands* of issues with the n2N project that required an indeterminable amount of time and resources to fix.  The issues lists identified both open and closed issues, with comments and relevant dates of discovery, projections for resolutions and dates the issues were closed.  n2N and Limited Brands held daily meetings, sometimes two to three per day, to review these issues.  Attendees included CW4, Limited Brands Vice Presidents of IT, Vice Presidents of Marketing, various n2N representatives, and two Deloitte representatives.  According to CW4, Deloitte facilitated much of the communication between n2N and Limited Brands executives over the progress of the program, in addition to Ruch's reports.  CW4 stated that Ruch was embroiled in arguments with n2N during the Class Period over the project's myriad issues.  Consequently, the project's schedules were set back numerous times in an effort to resolve these issues.  For example, the n2N website or "storefront" was initially supposed to "go live" in Fall 2007, but was pushed back several months later into 2008.  Even then, CW4 reported that there was no indication that the issues could be resolved in time to reach that goal.  In addition, CW4 reported that n2N's product demonstrations, which he described as

- 12 -

"embarrassing," were subject to thousands of issues and "not even close to workable." Thus, CW4 was in a position to know the facts attributed to him throughout this complaint and is sufficiently reliable.

36.     CW5 was an Internet Manager at VSD from November 2006 to August 2007.  Prior to that, CW5 worked as a Marketing Assistant at VSD beginning in 1998 and worked in various capacities on the VSD, Limited Brands and Bath & Body Works websites.  As Internet Manager, CW5 worked on business processes for the n2N platform and attended daily n2N meetings. Specifically, CW5 worked on certain parts of the VSD website where the n2N platform was to display images and manage multiple sets of data.  CW5 reported that n2N's demonstrations of these functions at an August 2007 meeting showed that the product lacked functionality.  CW5 further stated that *all* such n2N demonstrations, which he also described as "embarrassing," lacked functionality and were tailored as mere show pieces.  In addition, CW5 worked on testing n2N's product utilizing an HP Command Center.  This testing system included a "Sharepoint" application, which documented all test results and comments on "usability testing."  CW5 reported that n2N tests revealed many issues and defects plaguing the usability of its functions, which were documented in spreadsheet or Word documents as a list under each function.  The tests also revealed inconsistent data.  As a result, CW5 could not consistently "validate" data – a test used to determine if data from one source is identical to that source or if the data is corrupted when used by an application. According to CW5, consistent data was essential to the products' functionality.

37.     CW5 further reported that Limited Applications Manager Troy Blevins ("Blevins") and Senior Database Administrator Robert Graham ("Graham") began making comments about terminating the n2N project beginning in late 2006 as a result of n2N's failed functionality test results and data validation.  By December 2006, Blevins did not think n2N could produce a

- 13 -

functional system.  Thus, CW5 was in a position to know the facts attributed to him throughout this complaint and is sufficiently reliable.

38.     CW6 held various high-level IT jobs at Limited Brands.  CW6 was a Senior Technical Assistant from 2000 to September 2004; a Project Consultant from September 2004 to June 2007; and a Financial Systems Manager at VSD (an IT position) from June 2007 to 2009.  As a Financial Systems Manager, CW6 maintained VSD's financial reporting systems.  CW6 also worked on the n2N project, where he pulled information off of VSD's existing system in order to create interfaces for the new n2N system.  In this capacity, CW6 had direct communications with Mark Delcher ("Delcher") and Wendy LaHaye ("LaHaye"), both former Limited Brands' employees and high-level technical managers at n2N.  According to CW6, n2N's software required extensive modifications to be able to interface with VSD's website, and n2N was not close to resolving these modifications by Summer and Fall 2007.  In addition, CW6 reported that Limited Brands had yet to receive a functioning product from n2N by Summer and Fall 2007 and, therefore, was unable to begin the process of integrating the new platform with VSD's existing system.  Once the n2N product was received (if at all), it would take at least another *year* for n2N and Limited Brands to interface the new platform and make it operational.  Thus, according to CW6, defendants could not have reasonably believed that the n2N platform would be operational before the end of 2008.

39.     In addition, CW6 reported that Limited Brands failed to perform "parallel testing" of the new DC system, whereby the old system remains online while problems with the new system are discovered and resolved, before "going live" with the new system.  As a result, the new DC experienced numerous system glitches and training problems without a working back-up system, hindering its capacity and performance.  CW6 also confirmed that internal reporting was done to apprise Limited Brands' executives of the status of the DC and n2N projects throughout the Class Period and that, contrary to defendants' Class Period statements of normal problems, the actual level

- 14 -

of disarray for both projects was "way beyond normal." Thus, CW6 was in a position to know the facts attributed to him throughout this complaint and is sufficiently reliable.

## BACKGROUND TO THE CLASS PERIOD

### The n2N Venture

40. Prior to the Class Period, VSD operated on an internally created mainframe operating system. By 2006, VSD's burgeoning business had outgrown this antiquated system, and Limited Brands sought to replace it with new "front-end" technology that would enable VSD to interact with customers in real-time through online merchandising displays and e-mail promotions. VSD also wanted this new technology to provide an e-commerce storefront, a contact center, and order management applications, all managed by cross-channel retail workbenches. Migrating VSD off of its outdated mainframe system was part of a larger IT initiative at Limited Brands – referred to as the "Insight" project – to upgrade and modernize its various IT systems. The project was also part of a program specific to VSD called "Direct to Consumer," or "DTC," which also included a new, upgraded DC and software management system for VSD. Defendants knew that creating this alternative platform was essential to the growth of VSD, which, according to defendants, was Limited Brands' "fastest growing channel."

41. Rather than develop the new platform in-house, Limited Brands and VSD decided to form a new, third-party venture funded, in part, by Limited Brands to develop the new system. In the Spring of 2006, defendants Redgrave and Turney, along with Ruben Pinchanski ("Pinchanski"), then Executive Vice President of Limited Brands Direct, and others, met with executives of private equity firm General Catalyst to discuss possible joint funding of the new venture by General Catalyst and Limited Brands. The new venture was to be a stand-alone software company that, partnering with VSD, would create an innovative platform to power not only VSD's web-based sales, but also, in a later phase of the company's operations, to be marketed to other mega-retailers. On June 12,

- 15 -

2006, Limited Brands and General Catalyst entered into a letter agreement ("Agreement") setting forth the terms of the new venture. The venture was incorporated as Everest Commerce, Inc. on June 13, 2006 and soon thereafter changed its name to n2N.

42.     Pursuant to the Agreement, as negotiated by defendants Redgrave and Turney, VSD was to make substantial contributions to n2N's platform development project, including, *inter alia*, providing n2N with critical design specifications, documentation and other development support. In addition, Limited Brands would contribute to the joint venture's success by installing its own employees in key positions as n2N's founders and leaders. Accordingly, Pinchanski became n2N's co-founder, CEO and one of five directors, and Steven Asbaty, Vice President of Internet Sales at Limited Brands, became n2N's Chief Partnership Officer. In addition, LaHaye, who led Limited Brand's Direct to Consumer eCommerce strategy and development, became n2N's Chief R&D and Innovation Officer, and Delcher, a former Director of Technology at VSD, became n2N's Vice President of Technology Integration.

43.     In addition, the Agreement ensured that Limited Brands and VSD were able to evaluate and negotiate directly with n2N's key vendors. Accordingly, on numerous occasions, representatives of Limited Brands and VSD directly assured n2N's vendors, in words or substance, that they "should treat n2N as if it were Limited Brands because we will not let it fail." Further, pursuant to the Agreement, defendants Redgrave and Turney, along with Pinchanski, would serve as n2N directors, with General Catalyst electing the remaining two directors.

44.     Under these terms, General Catalyst and Limited Brands initially invested $19.8 million and $10.6 million, respectively, in the n2N joint venture. The Agreement also provided for the possibility of an "Additional Closing" at which time the parties would make additional investments in n2N. In order for the Additional Closing to occur, however, n2N was required to complete certain milestones, including the tender of Release 1 to VSD for User Acceptance Testing

- 16 -

by April 23, 2007 and the development of the Release 2 Joint Work Plan by April 30, 2007. Because n2N failed to meet these milestones, the Additional Closing never occurred.

**The DC**

45.     At the same time, in late 2006/early 2007, Limited Brands was building a new DC for VSD, to open in August 2007.  This project involved the "back-end" of the mainframe for VSD catalogue and online orders and a new ERP system made by Manhattan Associates ("Manhattan") called Pick Ticket Management System, or "PkMS."  Manhattan's system was initially designed for point of sale distribution – similar to a warehouse that distributes inventory to a company's brick and mortar stores.  Because the DC was shipping to a vast number of consumer residences instead of stores, however, this software needed to be adapted for the DTC concept.  This adaptation, along with financial enhancements to permit real-time individual invoicing instead of batch runs, required large scale customization.  In addition, the new system was to receive order information from the VSD mainframe, determine the exact location of the inventory ordered and transmit the orders to handheld units carried by floor workers.  The handheld units would then direct the floor workers to a particular location where they would pick up the product, take it to a conveyor system and log the placement.  Once logged, the system would send the items to the shipping department with shipping instructions.  The new system was also intended to track inventory, purchasing, receiving schedules, and placement of inventory in the DC once it arrived, all while interacting with the new n2N software.

46.     Throughout 2007, defendants touted the new n2N and DC projects as "key strategic imperatives" that would help drive the Company's 2007 growth.  For example, on January 31, 2007, after announcing that VSD would "power its $1.3 billion annual direct-to-consumer business with n2N's on-demand software in the second half of 2007," defendant Turney touted n2N's software as VSD's "*only*" solution and told investors that it would "***drive down operating costs***":

"We have concluded that there's no competitive advantage in owning and operating a costly direct-to-consumer technical infrastructure". . . . "Sustainable advantage comes from excellence in merchandising, marketing, and service. *Only n2N can address our requirements: n2N's breakthrough solution will empower our merchants, marketers, technologists, and client service associates to define and implement new business practices we only dream about today*. And since it's delivered on-demand as a service, *we will drive down operating costs* and always have access to the latest technologies and applications."

47.     Defendant Redgrave added that "'*[w]e believe n2N will reshape the retail industry*." . . . "Having an independent technology provider focused on the large multi-channel retailer will allow our entire industry to re-think the expensive and difficult path of building everything ourselves. We're pleased to join with General Catalyst Partners to enable this shift.'"

48.     On March 1, 2007, after reassuring investors that defendants "remain[ed] fully committed to [their] 12% compounded EPS growth goal," defendant Redgrave again touted both the n2N initiative and new DC as "key strategic imperatives" driving Limited Brands' projected 2007 growth:

> Taking a minute to look at this future growth and specifically 2007, we remain focused on the six *key strategic imperatives* that we presented at our Investor Relations update meeting in November.
>
> *          *          *
>
> *Our fourth growth imperative relates to our investment in infrastructure to support our future growth*. We are very focused here on two primary initiatives. First is the enterprise-wide multiyear project to standardize and upgrade our technology in three areas. Shared services, customer relationship marketing, and supply chain.
>
> *          *          *
>
> *Second is our initiative to support the growth of our direct businesses through the construction of a new distribution center and the development of new front-end technology*. This activity, which began late last year, will continue into 2010.

49.     Defendant Redgrave continued to tout these initiatives on May 24, 2007, telling investors that Limited Brands was "investing in new technology and distribution center capacities to

- 18 -

support the growth of both [its] existing Victoria's Secret direct business and [its] new Bath & Body Works direct business," and that defendants "***remain[ed] confident [these investments] [would] deliver future positive returns***."

50.     In addition, on June 25, 2007, defendant Redgrave continued to highlight the Company's technology and IT system initiatives, including the n2N venture and new DC, as growth drivers for the Company:

> The fourth initiative [driving 2007 growth] is really around building infrastructure. And we could talk about this all day long. But the fact is, is we are investing and rearchitecting the systems and processes of the enterprise, supply chain systems, store-based systems, customer relationship management systems, shared services type of capabilities for the enterprise as a whole, ***to really position us and to enable us to grow at the rate that we're targeting to grow***.
>
> *                *                *
>
> ***These are the drivers of overall EPS growth*** that we are targeting in our long-range plan to add up to that 10% to 15% annual growth, or the targeted growth rate of 12% compounded that I showed you on the very first slide, and the 15% return on invested capital.

51.     Further, on July 23, 2007, n2N issued a press release stating that "Victoria's Secret Direct will begin to operate its $1.4 billion direct-to-consumer business on n2N's on-demand platform in the second half of 2007." In the press release, defendant Turney continued to tout n2N's software, stating, "'[Limited Brands'] decision to embrace the n2N platform was strongly influenced by the promise of ongoing technology innovation." . . . "n2N's impressive Platform Innovation Ecosystem is a ***key element*** in ensuring a ***robust infrastructure*** on which we can grow our business for many years.'"

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

52.     By August 22, 2007, the start of the Class Period, defendants knew that neither the DC or n2N projects would drive the Company's growth as defendants had led investors to believe. Defendants, however, failed to correct their prior statements and continued to make positive, albeit

- 19 -

false or misleading, statements about the n2N and DC projects, and their ability to drive the Company's growth, throughout the Class Period.

53. On August 22, 2007, Limited Brands issued a press release announcing reported EPS for the second quarter ended August 4, 2007 ("2Q07"). In the press release, the Company stated "*that it [was] comfortable with First Call consensus earnings per share estimates for the third and fourth quarters of $0.04 and $1.18, respectively*."[2] According to the press release, "[t]his outlook includ[ed] the impact of *all the previously announced transactions and initiatives and our view of fall business performance*," including the n2N and DC initiatives.

54. The next day, August 23, 2007, Limited Brands held an earnings conference call to discuss its 2Q07 results. During the conference call, defendant Burgdoerfer reiterated the Company's 3Q07 and 4Q07 earnings guidance:

> Now turning to the specifics on third quarter and fourth quarter guidance, *we are comfortable with the current First Call consensus earnings estimates of $0.04 for the third quarter and $1.18 for the fourth quarter*. The third quarter estimate is predicated on flat comp store sales versus a 16% increase last year, and a sales decline in the low single digits.

55. In addition, defendant Redgrave announced that the Company had "*just opened a brand-new distribution center to support the growth of both the existing Victoria's Secret direct business and the new Bath & Body Works direct business*." Defendant Turney added that, although total segment operating income for Victoria's Secret had declined 13% in the second quarter, due, in part, to expenses associated with the new DC, "*[t]hese investments support the future growth of [Victoria Secret's] direct business*." In addition, defendant Turney reassured investors that the DC was experiencing only "*normal implementation issues*":

---

[2] Defendants' false and misleading statements in quotations are in bold throughout.

[T]he catalog and the Internet channel continues to be an important part of the 360-degree aspect we provide our customers and we maintained momentum through the second quarter in the direct channel.

**We are pleased that our new state-of-the-art distribution center opened in August, and that the new 1 million square foot distribution center will support the long-term expansion of the direct channel. The new DC has capacity to handle over 40% more volume than our old DC.** We are still in the midst of a controlled start of the new distribution center, while we continue to work through **normal implementation issues**, we are excited about the expanding capabilities the new facility will provide us, from an operational perspective.

56. As a result of defendants' positive August 22 and 23, 2007 statements regarding the new DC, Limited Brand's stock price increased 6.47%, to close at $22.77 on August 23, 2007.

57. Analysts responded favorably to defendants' statements. For example, on August 24, 2007, *Jefferies & Company, Inc*. reported that defendants' "comfort with 2H '07 expectations is a **positive**." Similarly, on August 24, 2007, *CL King & Associates* reported that, based on defendants' representations, "[e]xpenses related to technology and construction of the new VS Direct DC **will not exist in FY08**."

58. Defendants' August 22 and 23, 2007 statements were false and misleading and their guidance without reasonable basis. As detailed in ¶¶98-106, and contrary to their claim of "**normal implementation issues**," defendants knew by August 22, 2007, that the DC was experiencing significant software and operational problems resulting in numerous shipment errors and "lost" items. According to CW6, Limited Brands failed to properly test the new DC system prior to its August 2007 implementation. Normally, to implement such a comprehensive and complex new system, Limited Brands would conduct "parallel testing," whereby the old system continued to operate while glitches and issues were discovered and resolved as the new system came online. With the DC, however, Limited Brands simply turned off the old system and "went live" on the new system without testing for or resolving any of its problems. As a result, the DC experienced numerous software and training problems without a working backup system. According to CW4, the

- 21 -

problems were so substantial that in the months following the DC's August 2007 implementation, its daily volume was ***less than*** that of the prior system.  Consequently, by August 2007, Limited Brands had employed a special team tasked specifically with fixing the pervasive problems plaguing the DC.

59.     In addition, defendants knew that the n2N project was not proceeding as defendants had previously led investors to believe.  From its inception, Limited Brands had insisted on features and functions far beyond the scope of the original plan and failed to provide timely specifications and documentation for proper implementation of the project.  As a result, n2N was unable to meet its April 2007 milestones, and, therefore, receive necessary additional funding.  Moreover, according to CW3, CW4 and CW5, n2N's demonstrations for Limited Brands, beginning in June 2007, showed that the product was not functional and failed to meet the Company's specifications.  CW4 confirmed that by August 2007, it was clear from daily internal "issues lists" that n2N's software was not going to work.

60.     As a result of the problems affecting the DC and n2N projects, defendants' 3Q07 and 4Q07 EPS guidance of $0.04 and $1.18, respectively, which, according to defendants, was based on these technology initiatives, lacked reasonable basis.

61.     On September 5, 2007, Limited Brands presented at a Goldman Sachs 14th Annual Global Retailing Conference.  At the conference, Senior Vice President of Limited Brands Investor, Media, and Community Relations, Tom Katzenmeyer ("Katzenmeyer"), an authorized spokesperson for the Company, continued to tout VSD's business and technology initiatives, including the DC and n2N projects:

> We also think we have ***significant growth opportunities*** in internet and the internet and catalog business.  And we're investing in new front-end internet and call center systems from all our direct channel businesses at this point in time.  ***In fact, we just opened a brand new distribution center to support that growth in Columbus***.  That happened in the month of August.  ***We also have major technology initiatives going on in the supply chain, shared services, and customer relationship marketing area***.

62.     On September 6, 2007, Limited Brands issued a pre-recorded message regarding its August 2007 sales results. In the message, Vice President of Limited Brands Investor Relations, Amie Preston ("Preston"), an authorized spokesperson for the Company, told investors that the new DC had experienced some delays in shipment times, resulting in a decrease in net VSD sales. Preston told investors, however, that the DC would "**be operating under normal ship times by the end of September [2007]**" and to expect a "**significant increase** in September sales":

> Turning to Victoria's Secret Direct – as you know, we transitioned to a new distribution center in August. As a result we experienced delays in shipment times. While we anticipated some delay, it is taking longer than we initially anticipated to get the new DC to full capacity and as a result the ship time is currently longer than we anticipated. Demand from customers as measured by orders received was roughly flat for the month of August. However, sales are not recognized until orders are received by customers. As a result of the shipping delays Victoria's Secret Direct net sales were down 64% to last year in August.
>
> **At this time we anticipate that the DC will be operating under normal ship times by the end of September and we expect a significant increase in September sales versus last year as we clear the current backlog.** The August gross margin rate was down significantly at Victoria's Secret Direct and below expectations due to incremental costs associated with upgrading shipments to customers and labor costs to stabilize the DC operations.

63.     These statements were false or misleading because, as detailed in ¶¶98-106, they failed to disclose the DC's significant operational problems. According to CW1 and CW2, the new DC systems required substantial training to operate them properly. Limited Brands and VSD, however, failed to adequately train the DC staff prior to the DC's implementation in August 2007, resulting in confusion and delays on the DC floor. In addition, unresolved software "bugs" and ongoing software customization further hindered its functionality. As a result, the DC was experiencing numerous shipping problems, such that defendants knew by September 6, 2007, the DC would not be "operating under normal ship times by the end of September."

64.     On September 17, 2007, n2N issued a press release touting its technology platform. In the press release, n2N stated that "**Victoria's Secret Direct will begin running its $1.4 billion**

- 23 -

*business on n2N's platform in early 2008*." As directors and control persons of n2N, defendants had the ability to correct or amend this public statement, but did not.

65. In an interview reported in the October 2007 edition of Apparel Magazine, defendant Turney told readers that the n2N software would allow Limited Brands to "*double*" its direct sales business in the next five years and that: "*Overall, we're very excited about the implementation. It's going to add a lot of value to our business. We're very dedicated to it. We've got a lot of people focused on it, and I think it is going to set us up for growth for the future*." When specifically asked about any implementation challenges regarding the n2N software, Turney told the interviewer that Limited Brands had encountered only "'*the normal glitches, but nothing major*'":

> [Apparel Magazine]: What challenges have you encountered, if any, so far in your testing and implementation process? What has been the company's experience from the perspective of change management?
>
> [Sharon Turney]: You know, it's interesting. The teams have really worked very closely together in terms of change management. Everybody is pretty excited about how much more efficient everything will be.
>
> As far as the testing goes, *there've been the normal glitches, but nothing major*.

66. As detailed in ¶¶107-118, defendants' September and October 2007 statements regarding n2N were false or misleading and failed to disclose the n2N project's numerous failures. According to the GC Complaint, by August 2007, Limited Brands already wanted to "shut down" n2N. CW4 confirmed that it was clear by August 2007 that the n2N system was not going to work. Spreadsheets tracking n2N's progress identified thousands of functionality "issues" that required an indeterminable amount of time and resources to fix. Further, *none* of n2N's demonstrations of the software, which CW4 and CW5 described as "embarrassing," were even close to workable. In addition, according to the GC Complaint and CW4, Limited Brands continued to make major architectural changes to the software's design, causing development to start over again for components of the platform and further hindering the project's progress. Moreover, according to

- 24 -

CW6, n2N's software required extensive ongoing modifications to be able to interface with VSD's website. CW6 reported that n2N was not even close to completing these modifications by Fall 2007. As a result of these numerous issues, from August to November 2007, the entire "go live" schedule for n2N was pushed forward at least three times. Even with a revised "go live" date well into 2008, however, CW4 reported that there was no indication that the thousands of issues plaguing the n2N project would be resolved in time to meet that deadline. And, according to CW6, even if Limited Brands had received a functioning product by Fall 2007 (it had not), it would still take another year to interface the new platform for it to be operational. Consequently, defendants could not have reasonably believed that the n2N project would be operational prior to the end of 2008.

67.     In addition, according to the GC Complaint, defendants *admitted* in a September 10, 2007, draft internal memorandum that "'[t]he current working relationship between Limited Brands and n2N is *not* efficient or effective for delivering a solution that can be implemented in Limited Brands within an acceptable time frame and budget.'" Thus, contrary to experiencing only "'the normal glitches, but nothing major,'" defendants knew that the n2N project was failing.

68.     On October 11, 2007, Limited Brands issued a pre-recorded message regarding its September 2007 sales results. In the message, Preston downwardly revised the Company's previously announced 3Q07 guidance of $0.04 to a range of $0.00 to $0.04. Preston, however, reassured investors that the Company had "*made significant progress in September*" and that the DC was "*now operating under normal ship times*":

> We now expect third-quarter earnings per share to be between $0.00 and $0.04 per share versus our previous expectation of $0.04 per share.
>
> *                   *                   *
>
> Turning to Victoria's Secret Direct, as you know, *we transitioned to a new distribution center in August* and experienced delays in ship times in August and into September. August sales were down 64% as a result. *We made significant progress in September* and sales were up 27% to last year. *The distribution center*

*is now operating under normal ship times and we are targeting to offer the full range of shipping options including one day by the end of October*.

69.     The DC, however, was *not* "operating under normal ship times" by October 11, 2007. To the contrary, the DC continued to experience severe systemic and operational problems resulting in the shipment to many customers of the wrong products, the wrong quantities or no items at all. According to CW1, these problems, which began in August 2007 with the DC's implementation, persisted until February 2008 and significantly inhibited the shipment and flow of merchandise.  As set forth in ¶¶103-104, 120-122, 125, defendants were aware of these problems via daily reports.

70.     Despite the DC's ongoing problems, defendants continued to tout the Company's business, particularly heading into the fourth quarter, which typically accounted for over one third of the Company's annual sales and the bulk of its operating income.  On October 16, 2007, defendant Wexner presented at an all-day analysts' meeting in Columbus, Ohio.  During the meeting, Wexner told analysts that the Company was "better planned than [it had] ever been going into [the] holiday [season]," and that defendants "d[id]n't see *any* inventory problems":

> *I think we are better led and better planned than we have ever been going into holiday for many years. . . .  We are drastically better planned than last year*. . . . There is no overhang or distractions from systems installations, inventory is reduced in line and we don't see any inventory problems.  If the inventory and the merchandise have been thoughtfully planned – hopefully it is and will be desired by our customers – I think we could and should have a very good holiday and hopefully we will get more of our fair share.  *We enter into it very clear eyed, very controlled, very disciplined and very well thought out in our merchandising*."

In addition, defendant Wexner described the Company's planning as "*conservative*, though we didn't pull in our horns completely.  It's sounder but still conservative. . . . *I feel very confident and very much at ease going into this holiday season*."

71.     Analysts reported favorably based on defendants' representations.  For example, on October 12, 2007, *CL King & Associates* reported that "[t]he DC achieved *normal shipping times* in the second half of September."  On October 17, 2007, *The Buckingham Research Group* reported

that, with regard to the DC issues, "[t]he glitches are being worked out and third day air shipments back in place. Next and second day shipping options are expected to be restored by the end of October." Similarly, on October 17, 2007, *Cowen and Company* reported:

> "**Investment in DC to support future growth initiatives**. Management reaffirmed progress in its transition to a new DC which caused a hiccup to VSD sales in Aug., but rebounded in Sept . . . . Management continues to expect normal ship times and are on track to offer the full range of shipping options (including expedited shipping) by the end of Oct. We anticipate the new DC (+40% more capacity) should be sufficient to support LTD's future growth initiatives."

72. On October 25, 2007, Katzenmeyer and Preston presented on behalf of Limited Brands at the SIG 3rd Annual Consumer Focus Forum. During the forum, Preston reiterated the Company's 2007 guidance, stating: "*we're targeting 12% plus growth in earnings per share* and we have several opportunities for growth across both of our businesses."

**Investors Begin to Learn the Truth About the DC**

73. On November 8, 2007, Limited Brands issued a pre-recorded message regarding its October 2007 sales results. In the message, Preston reported that "October comps on a calendar basis were down 6%, below expectations for a flat comp." In addition, Preston told investors that, "[a]lthough *demand remains very strong*," the progress in ramping up capacity at the DC was slower than expected and, as a result, the Company was taking actions to reduce 4Q07 demand and sales:

> Turning to Victoria's Secret Direct, as we've previously communicated, we transitioned to a new distribution center in early August and experienced delays in ship times in the third quarter. August sales were down 64% and September sales were up 27% as we cleared throughout some of the August backlog. August and September margins were also negatively impacted due to incremental costs to stabilize the DC and upgrading shipments to customers.

> \*       \*       \*

> Our progress in ramping up capacity at the DC has been slower than expected. Although *demand remains very strong*, we want to insure that we don't disappoint our customers. And, therefore, we have taken actions, including reducing catalog circulation which will significantly reduce fourth-quarter demand and sales.

- 27 -

74.    In response to defendants' partial disclosures concerning the difficulties with the new DC and its impact on sales, the price of Limited Brands common stock fell over 13% over the next two trading days, from $20.61 on November 7, 2007 to $17.94 on November 9, 2007, on heavy trading volume.  The stock price remained inflated, however, as a result of defendants' positive, albeit misleading, reassurances of "***very strong***" demand and their failure to fully disclose the negative affects of the DC and n2N projects on VSD's and Limited Brands' operations.

75.    On November 20, 2007, Limited Brands issued a press release reporting its earnings for 3Q07.  According to the press release, EPS for 3Q07 were $0.03, below defendants' August 22, 2007 guidance.  With respect to 4Q07, the press release downwardly revised its previously stated EPS guidance to a range of $0.90 to $1.05 due, in part, to "issues related to the opening of a new distribution center."

76.    Later that day, on November 20, 2007, defendants held an earnings conference call with analysts to discuss the results.  On the conference call, defendant Burgdoerfer reiterated the Company's decreased 4Q07 EPS guidance of $0.90 to $1.05, stating that it was "primarily attributable to a reduction in our projections for Victoria's Secret [D]irect."  Defendant Turney added that the 40% decline in operating income for Victoria's Secret was also "primarily driven by decline at Direct."  Turney reassured investors, however, that "***[d]emand for the brand . . . remain[ed] very strong***" and that the DC was the Company's "***most significant operational priority***":

> [O]ur results at Direct were negatively impacted by the delays in shipping out of our new distribution center. ***Demand for the brand***, as evidenced by our orders from the catalog and the Internet channel, ***remain very strong***, but sales at Direct declined 7% in the quarter, due to the increased ship times and operating income decline[d] significantly.  The decline in operating income was a result of sales and related shipping and handling revenue decline.  The loss of higher margin, expedited shipping options and incremental labor hired to staff the DC and work on fixing the issue.  We are obviously disappointed that we've had to take steps to reduce this demand in the fourth quarter.  However, protecting the customer experience and her satisfaction with the brand is of paramount importance.  As Martyn [Redgrave] said,

- 28 -

***this is our most significant operational priority*** and we are working very hard to bring the DC up to full capacity and maintain customer satisfaction.

77.     During the conference call, defendant Redgrave further discussed the DC, reiterating

that "***Direct demand . . . remain[ed] very strong***":

> As you know, we opened the new distribution center for Victoria's Secret Direct in early August.  As we described in our October sales call, it has taken us longer than we had anticipated to ramp up this new DC to full capacity.  This has had a negative impact on our third quarter results, and we now expect that it will have an even more negative impact on our fourth quarter results.
>
> \*        \*        \*
>
> The fact is that the hard change over the new integrated processes, mechanical equipment, and IT systems is taking us longer than expected to stabilize.  We appear to have hit a limit on how much we can process through the new center and we need to be able to substantially increase our throughput to serve the volumes that we expect for holiday and January's semi annual sale.
>
> ***Direct demand at Victoria's Secret remains very strong*** and we want to ensure that we don't disappoint our customers.  Therefore we have taken actions to constrain[] the volume of orders we will take, including reducing catalog circulation, which will significantly reduce fourth quarter direct demand and sales.  Now, ***getting the direct DC up to full capacity is without question the most significant operational priority that we have***.  We have our best internal people, as well as outside vendor experts and independent experts evaluating the situation, and we are looking at a range of options to make changes.
>
> \*        \*        \*
>
> Although . . . we will be negatively impacted by the issues at the Victoria's Secret [D]irect distribution center, we do believe that our brands are ***very strong*** and that we are ***very well positioned*** with respect to our assortment, our inventory levels and expense discipline.

78.     In addition, defendant Redgrave told investors that the Company was "reevaluating

the approach and timing" its other technology initiatives:

> As we have previously discussed, we also have two other significant technology projects under way.  As a result of the challenges that we've experienced with both the implementation of the supply chain systems at Bath & Body Works and the new direct distribution center, ***we are reevaluating the approach and timing of*** the supply chain systems rollout to Victoria's Secret and Mast [*i.e.* project Insight] and ***the development of the new front end technologies systems at Victoria's Secret Direct***.

- 29 -

79.     Distinguishing between Victoria's Secret stores and VSD, defendant Redgrave later clarified during the conference call that defendants were only "reevaluating" the timing of the supply chain systems in Victoria's Secret stores (*i.e.*, project Insight), but was conspicuously silent on the n2N project for VSD:

> [A]s I mentioned in the scripted remarks, we're evaluating the timing of the limitation of the supply chain systems for Victoria's Secret stores. ***It's important to distinguish that on one hand we're talking about the Victoria's Secret Direct business, that's the distribution center. On the other hand, which is a completely separate organization and operation, is our store's operation, which is scheduled to implement the supply chain systems next year.*** As I indicated, we're reevaluating the timing of ***that*** implementation, particularly as we look at the other priorities that we have to deliver against and it is probable that we will change ***that*** timing in order to not disrupt the Victoria's Secret Stores business in 2008.

These statements were false or misleading and omitted material information because, as detailed in ¶¶107-118, defendants knew and failed to disclose that the n2N project was failing and that Limited Brands intended to withdraw its business from and stop funding n2N well before November 20, 2007.

80.     As a result of the disclosures about the DC, analysts questioned defendants about the depth and magnitude of the DC's problems and whether the problems would extend beyond 4Q07. In response, defendant Redgrave told the analysts that they had, in fact, "***expected***" the DC's limited capacity experienced in August, September and October 2007:

> [Analyst]: . . . I guess just a question on the magnitude and depth of the problem at the DC. I mean is this a full reengineering effort we have to undertake here? And what are the chances this extends beyond 4Q and into spring, would be, A.
>
> *          *          *
>
> [Martyn Redgrave]:     Jeff, in terms of the distribution center operation, just to step back and give you a little bit more perspective, because I'm sure this will be a source of a number of questions, the first thing I think you need to understand is in opening the center in August, ***we had expected a slow ramp up***. ***We did in fact ramp up at about the pace that we were expecting to ramp up at, to about the end of September and into October***. We saw a noise, if you will, in the operation of the center, but ***we didn't see an inability to break through the volume levels that we need to break through to service holiday***.

- 30 -

Over the last four weeks, as we've evaluated the performance of the center, we've concluded that there are some issues there that are going to cause us to have to limit the capacity of the center – that will limit the capacity of the center as we enter into holiday. The center itself obviously is a new operation for us. For instance, it utilizes a number of new capabilities that we've not had in our other distribution centers . . . . We're using a dynamic location picking system, which is very different than the static location picking systems that our traditional centers have used. We're using new high speed multiple stage conveyor systems, new handheld and laser reading scanning technologies. All of this is kind of new to us, not necessarily new to the world in terms of the way it's been utilized in other large scale distributions centers, but are just taking us longer than we had expected to kind of burn in these new processes, these new systems, and make sure that our associates in our distribution center fully understand how to utilize the new processes and systems.

Another point that I would give you as perspective is that **the center right now is operating at about 70 to 75% of our targeted capacity. In other words, the capacity we would need to be at to fully service holidays**. So that gives you a sense of the gap. . . . [W]e are obviously focused on stabilizing the systems, the processes, and the, [sic] and ensuring that our people are properly trained to operate these new systems and processes. We're working on all aspects of that on a very realtime basis with internal and outside experts, and at this stage, it's premature to say how long it's going to take to fully stabilize the center and whether or not it's going to have an impact on the spring. We do expect it will have some impact, though.

81.     In addition, in response to a follow-up question from analysts inquiring whether the DC, operating at 70% of capacity, could handle spring volume, defendant Redgrave told analysts that it "**[c]ould handle spring volume**."

82.     Analysts also questioned defendants about their intentions of "ramping up" the VSD business after slowing it down in 4Q07. Downplaying the effect of the Company's efforts to slow down demand, defendant Turney told investors that a ramp up was unnecessary because of "**very strong**" product demand and the DC's ability to "**handle the volume**":

[Analyst]: . . . I'm just kind of curious how you go about ramping a business, or ramping back up a business like Victoria's Secret Direct after slowing it down. In other words, do you envision a steep ramp or are you, or once you get the business stabilized, will you be more inclined to try to produce a soft ramp?

*       *       *

[Sharen Turney]: Basically this timeframe, this is when we really peak the business, around the holiday and semi annual sale. As we've come out of semi annual sea, the normal business subsides down to, all the way until we get back into semi annual.

- 31 -

The piece that we feel very confident in terms of the product. *The product demand has been very strong at Direct*. We continue to see that opportunity in the spring season. . . .

[Analyst]: Sounds like it's kind of a soft ramp, would that be correct?

[Sharen Turney]: Well, I don't – the thing about it is, *you're not really having to ramp up because you're coming out of a peak timeframe, where it, normally the volume drops. So because the volume drops, that distribution center will be able to handle that volume*.

83.     As a result of defendants' positive reassurances that the DC "*[c]ould handle spring volume*" in 2008 and of "*very strong*" *demand*, despite their downward revision of 4Q07 guidance, Limited Brand's stock price increased over 7% over the next two days, to close at $18.06 on November 23, 2007.

84.     On December 6, 2007, Limited Brands issued a pre-recorded message reporting November 2007 sales. Regarding the DC, Preston told investors that "*[t]here ha[d] not been any significant changes in the status of the DC*" since defendants' November 20, 2007 earnings conference call and that Limited Brands "*continue[d] to focus on maximizing the throughput of the DC for the holiday time period* while at the same time evaluating solutions."

85.     Defendants November and December 2007 positive statements about the DC were false or misleading and omitted material information because, as detailed in ¶¶98-106, the DC was (and had been for several months) experiencing severe software and operational problems. For example, DC workers were inadequately trained for the new systems prior to the holiday season – Limited Brands' busiest season. As a result of their limited training, DC floor workers had difficulty using the new system, often resulting in erroneous shipments to customers. In addition, the DC continued to experience significant "bugs" and software glitches through the end of 2007 and into 2008, further hindering its performance. As outlined in ¶¶103-104, 120-122, 125, internal reports informed defendants of the DC's numerous problems.

**Investors Begin to Learn the Truth About n2N**

86. On January 2, 2008, *TechCrunch*, a technology website, issued an article announcing that n2N was "ceasing operations and that Victoria's Secret [would] not be using its technology." According to the article, "'[r]umor has it that the product [n2N] delivered for Victoria's Secret/Limited Brands was a total dud and VS dropped them. Almost everyone was let go late last week.'" Ensuing articles confirmed n2N's failure and Limited Brands' involvement in its demise. On January 3, 2008, *Xconomy Boston* reported that "[n2N] had missed a series of milestones in delivering its technology to key customer Victoria's Secret, prompting the lingerie firm to withdraw its business and essentially sealing N2N's fate." Similarly, on January 3, 2008, *Innovation Economy* reported that "the decision to shut-down n2N wasn't made by the full board, but by Limited Brands, which unfortunately was the company's lead investor and primary customer."

87. These articles disclosed, for the first time, the deterioration of the relationship between Limited Brands and n2N and the failure of the n2N project. As a result of these disclosures, Limited Brands stock price fell ***over 18%*** over the following six business days from $18.20 on December 31, 2007 to $15.08 on January 9, 2008.

88. Despite the n2N project's failure, defendants continued to mislead investors regarding the DC. On January 10, 2008, Limited Brands issued a pre-recorded message reporting December 2007 sales. Regarding the DC, Preston told investors in the message that the Company had made "***significant progress*** with DC output in December and ***were able to achieve daily output that surpassed our initial expectation***":

> ***We made significant progress with DC output in December and were able to achieve daily output that surpassed our initial expectation.*** As a result, we were able to take some actions to regenerate demand, including reactivating a free shipping offer for the semi-annual sale and increasing our email contacts. ***We have a thorough understanding of the issues at the DC, and we are working to implement the solution.***

- 33 -

89.     As a result of defendants' reassurances regarding the DC's progress, Limited Brand's stock rose over 2%, to close at $15.39 on January 10, 2008.

90.     Analysts responded favorably to defendants' statements.  For example, on January 11, 2008, *CL King & Associates* reported that "[t]he new VS Direct DC's operational problems recovery achieved greater-than-planned progress.  It had significant output gains with daily output above expectations, which enabled VS to increase its marketing and drive greater sales.  ***Management has a thorough understanding of the DC issues*** and is working to implement the solutions."

91.     On February 7, 2008, Preston again stated, in a pre-recorded message, that "***[w]e continue to make progress on addressing the operational issues related to the direct DC*** and are working on implementing the solution."  As a result of this continued reassurance, Limited Brand's stock price increased another 3.42%, to close at $17.75 on February 7, 2008.

92.     These statements were false or misleading, as they failed to disclose the full extent of the pervasive, ongoing problems at the DC and their expected impact on Limited Brands' and VSD's 2007 and 2008 financial results.

93.     Then, on February 27, 2008, Limited Brands issued a press release reporting fourth quarter and full year 2007 earnings.  According to the release, 4Q07 EPS were $1.10, or $0.94 excluding the impact of extraordinary items, and fiscal 2007 EPS were $1.89, or $1.21 excluding the impact of extraordinary items.  The February 27, 2008 press release also significantly lowered the Company's previously issued guidance for 2008, stating that the Company "now expect[ed] February comps in the negative low double digit range versus its previous guidance for negative mid to high single digit comps," and "expect[ed] 2008 first quarter earnings per share to be $0.05 to $0.10 compared to $0.13 per share last year."

94.     The next day, February 28, 2008, defendants held an earnings conference call with analysts to discuss the disappointing 4Q07 and 2007 results.  During the conference call, defendant

- 34 -

Redgrave announced that, despite their previous reassurances that the DC system "[c]ould handle spring volume," the DC's capacity problems would not be resolved until ***June 2008***:

> As we look back at 2007, we are clearly disappointed with our financial performance. . . .
>
> \*        \*        \*
>
> [I]t did take us longer than expected to get the new direct distribution center up to capacity. This resulted in a significant incremental cost in the second half of the year and forced us to proactively take steps to reduce demand in the fourth quarter.
>
> \*        \*        \*
>
> [W]ith respect to the direct distribution center, we continue to make progress and we are focusing on two key things. Our primary focus is on the things that face the customer including being able to fully meet the volume demands at our targeted accuracy levels and offering all expedited shipping options. ***We are targeting to have all of these issues resolved by the June semi annual sale this year***.
>
> At the same time, we are focusing on improving our overall efficiency and productivity within the DC. In relation to this effort, we do think it will take a longer period of time before we are completely where we need to be. ***As a result, in 2008, we will continue to be negatively impacted by higher costs associated with lower accuracy levels running the DC and implementing the solutions***.

95.    In addition, defendants publicly announced that the Company would no longer provide additional funding for or business to n2N and that, as a result, n2N had closed:

> [I]n the fourth quarter we and our investment partner in the front end technology venture for Victoria's Secret Direct [*i.e.* n2N] ***elected not to provide additional funding and that venture has closed***. We are currently evaluating alternative approaches to support the VSD business.

96.    In response to the disclosures concerning the impact of the difficulties with the DC and its impact on sales, the price of Limited Brands common stock fell ***nearly 15%*** from $17.13 on February 27, 2008 to $14.66 on February 29, 2008.

## FALSITY

97.    Defendants' statements about n2N and the new DC, and their ability to drive 2007 growth, set forth above, were materially false and misleading because they misrepresented and/or

- 35 -

failed to disclose adverse events surrounding the development of the n2N technology and the new DC, and their adverse impact on VSD's and Limited Brands' 2007 and 2008 financial results.

**DC Statements**

98.     Defendants' repeated reassurances throughout the Class Period about their progress and capacity at the DC were false or misleading.  Contrary to defendants' August 23, 2007 claim of "***normal implementation problems***," according to CW1, the DC was experiencing numerous implementation problems prior to and during the Class Period.  The problems were so substantial that from approximately August 2007 to February 2008, Limited Brands employed a special team tasked specifically with fixing the various problems plaguing the DC.

99.     According to CW2 and CW6, defendants failed to adequately train DC staff or test the new systems.  CW6 reported that to implement such a comprehensive and complex new system, Limited Brands would normally conduct "parallel testing," whereby the old system continued to operate while the new system was brought online and glitches and issues were discovered and resolved.  With the DC, however, Limited Brands simply turned off the old system and went live with the new system in August 2007 without any parallel testing.  As a result, system glitches and training problems remained unresolved as the new system went live, hindering its capacity and performance.

100.    In addition, according to CW2, the new automated system had significantly more steps than the old (approximately ten steps versus two previously), and DC workers were confused by the complexity and differences between the new and old systems.  CW1 corroborated these facts, stating that the new DC systems required substantial training to operate properly, but many of the DC floor staff had little training prior to its implementation or before the 2007 holiday season.

101.    The lack of proper training resulted in numerous human errors at various stages of the DC's automated system that received orders.  For example, CW1 reported that throughout the Class

Period, DC floor workers often misread or misunderstood the information on their handheld devices and filled orders with the wrong product and/or wrong quantities, resulting in erroneous shipments. In addition, numerous orders traveling on the elaborate new conveyor system were lost on a daily basis, either because the orders fell off or because they were taken off at the wrong location, resulting in piles of "lost" pieces that accumulated at various locations.  As a result of these problems, the DC was *not* "operating under normal ship times" as defendants told investors.  Rather, customers often received the wrong products, the wrong quantities, or no items at all.  Defendants later admitted in May 2008 that the DC problems and disruption to business cost Limited Brands approximately *$80 million* in Fall 2007.

102.    In addition, according to CW4 and CW6, the DC was experiencing unresolved "bugs" and software glitches throughout the Class Period.  Weekly meetings informed defendants that attempted "fixes" and customizations of the DC's software were ongoing during 2007 and into 2008. These problems were so substantial that in the months following the DC's August 2007 implementation, its daily volume was *less than* that of the prior system.

103.    According to CW1, defendants tracked the DC's various problems daily via different internal reports.  For example, a "Dashboard Report," which was distributed to VSD management every morning, showed the status on all inventory processes expressed in various metrics.  This report also included percentages of accurate orders shipped and percentages of errors made per order.  CW1 reported that by November 2007 – the beginning of the fourth quarter, which typically accounted for over 68% of the Company's total annual profit – the percentage of  erroneous shipments was *over 20% to 30%*.

104.    Defendants also tracked improvements being made to the DC processes, including the unidentified or "lost" items that had fallen off the conveyor, via a "Loose Piece Report," which contained an estimate of remaining "loose pieces."  CW1 stated that it was not unusual for the

- 37 -

inventory system and Loose Piece Report to show a ***thousand*** items in inventory that had been lost or misplaced. DC floor workers had to find these "pieces" and put them back in the correct inventory locations as defined by the new system. According to CW1, defendant Redgrave was a recipient of the Dashboard and Loose Piece Reports.

105. In addition, according to CW4, VSD held weekly status meetings to discuss the DC's problems and progress. Attendees included CW4 and Ruch, who reported directly to defendants Redgrave and Turney, along with other VSD management.

106. As a result of its numerous problems, defendants' repeated reassurances throughout the Class Period regarding the DC's "significant progress," "normal ship times," "very strong" demand and sufficient capacity were false or misleading, and their August 22, 2007, 3Q07 and 4Q07 EPS guidance, which, according to defendants, was based in part on the DC's ability to support growth, had no reasonable basis.

**n2N Statements**

107. Defendants' statements regarding n2N were also false or misleading and failed to correct their prior statements or disclose the project's early failure. Despite defendants' initial laudatory statements of support for the n2N project and its ability to support growth, Limited Brands and VSD hobbled the project just months into its development. According to the GC Complaint and Demand Letter, VSD failed to timely provide the specifications and documentation regarding software design to n2N as required by the Agreement. In addition, significant portions of the functionality of VSD's existing software, processes and performance criteria were completely undocumented. These gaps in essential specifications, which were known to Limited Brands and VSD before n2N's launch, frustrated n2N's design attempts and made n2N's work far more expensive and time-consuming than initially contemplated.

- 38 -

108.    Further, defendants knew that large and critical components of VSD's existing software – which n2N's software was intended to supplement – simply did not exist and had to be build from scratch.  For example, according to the GC Complaint and Demand Letter, VSD did not have an adequate content management tool suitable for the type of platform n2N was to construct.  Such a tool organizes the content to the web-based platform – the merchandise photographs, prices, sizes and related marketing text – without which web-based selling would be impossible.  The construction of this tool took many thousands of man-hours and increased the time and expense of n2N's early development efforts.

109.    In addition, from the outset, Limited Brands and VSD insisted on features and functions of the planned software that were far beyond the scope of the original plan, the Agreement with General Catalyst, or the requirements for general marketability of the platform.  Indeed, according to the GC Complaint, defendants Redgrave and Turney ***admitted*** to General Catalyst representatives during a September 18, 2007 n2N board meeting that Limited Brands and VSD had, in fact, altered n2N's focus from its original plan and caused the n2N project to be larger and more expensive than originally planned.  Moreover, in September 2007, Limited Brands and General Catalyst agreed to have an independent consultant, Twin Technologies, evaluate n2N's belated June 2007 Release 1 delivery.  On October 19, 2007, Limited Brands presented the findings during a telephonic meeting involving, among others, defendants Turney, Redgrave and Bergdorfer.  According to the Twin Technologies evaluation, n2N's delays were caused by additional functionalities requested by VSD and Limited Brands.

110.    Defendants also knew that the n2N project was experiencing myriad software issues or "bugs," which hindered its functionality.  According to CW4, by August 2007, it was clear that the system was not going to work.  Daily spreadsheets tracking the project's progress identified ***thousands*** of issues that required an indeterminable amount of time and resources to fix.

- 39 -

Throughout the Class Period, Limited Brands and n2N held daily meetings, sometimes two to three per day, to review these issues. According to CW5, the "issues" or defects plaguing n2N's functionality were documented in spreadsheet or Word format as a list under each function. In addition, according to CW6, the software required extensive modifications in order to interface with VSD's website. CW6 reported that n2N was not even close to resolving these modifications in Summer and Fall 2007. As a result of these issues, CW4 reported that from August to early November 2007, the entire n2N project schedule was pushed forward at least three times, pushing the internal "go live" date well into 2008. Even with a 2008 target, CW4 stated that there was no indication that n2N could resolve the issues plaguing the project in time to meet that deadline. CW6 corroborated these reports, stating that n2N had yet to deliver a working product by Fall of 2007. And once a working product was received (if at all), it would take at least another year to integrate the new platform. Thus, according to CW6, the n2N platform could not have been operational until the end of 2008, if at all – much later than defendants led investors to believe.

111. As a result of the software's numerous problems and Limited Brands' failure to provide timely specifications, n2N was unable to meet its April 2007 milestones and, therefore, the Additional Closing contemplated in the Agreement never occurred. Defendants knew that failing to raise additional capital was fatal to n2N's continued viability. According to the GC Complaint, as early as August 2006, the n2N Board of Directors, including defendants Turney and Redgrave, received an Appraisal Report of n2N's Non-Voting Common Stock, which indicated that "[n2N] expect[ed] to show losses and negative cash flow until at least 2009 and expect[ed] that cash requirements [would] total approximately $40 million before positive cash flow [was] obtained."

112. Despite missing its April 2007 milestones, n2N delivered to Limited Brands a version of the first release for the n2N platform in June 2007. According to CW4, n2N's demonstrations of its product for Limited Brands and VSD, which CW4 and CW5 described as "embarrassing," were

plagued by thousands of issues and "not even close to workable." CW3 confirmed that n2N's demonstrations were weak and not functional.

113. In addition, according to the GC Complaint, after n2N's demonstrations for VSD and Limited Brands, VSD and Limited Brands suddenly requested hundreds of additional, new functionalities that had neither been contemplated at the start of n2N nor set forth in the Agreement. n2N told Limited Brands that these changes would add expense and time to the project that were not part of the original deal, and General Catalyst raised these issues to defendants in June 2007 and at a meeting of n2N's Board of Directors on July 18, 2007.

114. Further, defendants knew that n2N's development was hindered by Limited Brands' and VSD's failure to retain the core group of their employees that served as the day-to-day contacts with n2N. For example, on July 31, 2007, Limited Brands announced the departure of Len Schlesinger ("Schlesinger"), Limited Brands' former President, Chief Operating Officer and Vice Chairman. Schlesinger had been part of the original team at Limited Brands heading the n2N project. In addition, according to the GC Complaint, Donna Johnson and Steve Cohn, both Vice Presidents of Limited Brands' Web Operations, and Kate Bailey, Limited Brands' Head Web Merchant, all left Limited Brands at critical early stages in n2N's development efforts. This core group of people had been involved with n2N in designing the plans and specifications for the n2N software and were to be instrumental in the joint venture going forward.

115. Despite these problems, defendants continued to assure investors during the Class Period that Limited Brands was "*investing in new front-end, Internet, and call center systems for all of our direct channel businesses*" and that the n2N project would "*add a lot of value to [Limited Brands'] business*." Moreover, defendants assured investors in October 2007 that the n2N software would allow Limited Brands to "*double*" its direct sales business in the next five years and had encountered only "'*the normal glitches, but nothing major*.'" These statements, made *after*

- 41 -

Limited Brands determined that n2N failed to meet its April 2007 milestones and at a time when n2N was significantly undercapitalized, experiencing severe functionality problems and hindered by VSD's failure to provide timely specifications, had the effect of misleading investors as to the success of the joint venture as a driver of VSD's growth.

116.    In addition, despite their continued public appraisals of n2N, by the start of the Class Period, defendants had already decided to abandon the project.  According to CW5, Limited Brands Applications Manager, Blevins, and Limited Brands Senior Database Administrator, Graham, began making negative comments as early as late 2006 about terminating the n2N project due to its failing of functionality tests.  CW5 reported that by December 2006, Blevins did not believe n2N could produce a functional system at all.  In addition, according to the GC Complaint, a Limited Brands employee told an n2N employee in August 2007 that high-level executives at Limited Brands wanted to "shut down" n2N.  Further, defendants admitted in a September 10, 2007 draft internal memorandum that "'[t]he current working relationship between Limited Brands and n2N [was] ***not*** efficient or effective for delivering a solution that [could] be implemented in Limited Brands within an acceptable time frame and budget.'"  The memorandum, which stated that it was the "8th Draft for Review and Discussion," had clearly been circulating within Limited Brands during at least part of Summer 2007.

117.    In November 2007, Limited Brands told General Catalyst that it was considering taking the entire development project in-house.  Less than a month later, in December 2007, Limited Brands formally told General Catalyst that neither it nor VSD would continue to support n2N. Having lost its principal investor (Limited Brands) and only customer (VSD), n2N was forced to close its doors in December 2007.

118.    As a result of n2N's numerous problems and early failure, defendants' repeated reassurances throughout the Class Period regarding its success, and their omissions regarding its

- 42 -

failure, were false or misleading, and their August 22, 2007, 3Q07 and 4Q07 EPS guidance, which, according to defendants, was based in part on the n2N project's ability to support VSD's growth, had no reasonable basis.

### ADDITIONAL SCIENTER ALLEGATIONS

119.    As alleged herein, defendants acted with scienter in that each defendant knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company, as set forth herein, were materially false or misleading when made.  Defendants knew that such statements or documents would be issued or disseminated to the investing public and they knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  As set forth herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Limited Brands, its business and finances, their control over Limited Brands' allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning Limited Brands, were active and culpable participants in the fraudulent scheme alleged herein.

120.    Defendants knew about the DC's problems throughout the Class Period through various internal reports.  According to CW1, defendant Redgrave and other VSD management received a Dashboard Report every morning during the Class Period which showed the status of all DC inventory processes in various metrics.  The report also included the percentages of accurate orders shipped and percentages of errors per order.  CW1 reported that by November 2007, the beginning of the 2007 fourth quarter, the percentage of erroneous shipments was *over 20% to 30%*.

121.    Defendants also tracked improvements being made to the DC processes, including unidentified or "lost" items that fell off the conveyor belt, via a Loose Piece Report.  CW1 stated that it was not unusual for the inventory system and Loose Piece Report to show a thousand items in

- 43 -

inventory during the Class Period that had been lost or misplaced.  Under the new system, DC workers had to physically find each of these "loose pieces" and put them back in the correct inventory locations.  According to CW1, defendant Redgrave, along with other VSD management, received this report.

122.    In addition, according to CW4, Limited Brands and VSD tracked and itemized the DC's various "defects," performed an impact analysis of the impact to the system for each defect and recorded an action plan to resolve the problems.  The defects were rated at levels of severity, with "Severity 1" being the worst.  These reports informed defendants of the DC's numerous problems throughout the Class Period.

123.    The status of the DC was also reported in weekly meetings during the Class Period attended by VSD management, including Ruch and CW4.  Ruch reported directly to defendants Redgrave and Turney.  According to CW4, once the DC was implemented in August 2007, "nothing went as planned."  In the first few months after its implementation (*i.e.*, August – November 2007), the daily volume of the new DC was *less than* the prior system's as a result of unresolved software "bugs" and ongoing customization of the Manhattan application.  In addition, the new system proved much more difficult for DC floor staff to operate than the prior, simpler system.  The software "fixes," additional customization and work Manhattan personnel performed on the new system were discussed in the weekly status meetings.  These meetings also included discussion of operational issues, such as DC floor workers' confusion over how to handle orders that were lost on the conveyor, inventory that was out of place, conflicting information on their handheld units, and other discrete issues.

124.    Defendants also knew of n2N's various problems and failures throughout the Class Period.  According to CW4, Limited Brands and n2N tracked n2N's progress using daily spreadsheet "issues lists."  CW4 reported that by August 2007, these issues lists identified *thousands* of issues

that required an indeterminable amount of time and resources to fix. The lists also included comments, relevant dates of discovery, projections for resolutions and dates issues were closed. During this time, Limited Brands and n2N held daily meetings, sometimes two to three meetings per day, to review n2N's myriad issues, attended by Limited Brands Vice Presidents of IT and Marketing (including CW4), various n2N representatives and two Deloitte representatives. According to CW4, Deloitte facilitated much of the communication between n2N and Limited Brands executives regarding the project's progress, in addition to Ruch's reports.

125.    CW6 confirmed that reporting was done internally to apprise Limited Brands' executives about the status of the DC and n2N projects throughout the Class Period. According to CW6, defendants' statements that the Company was experiencing only normal problems with the n2N and DC projects were untrue, as the actual level of disarray for both projects was "way beyond normal."

126.    In addition, CW4 reported that from August to November 2007, the entire n2N project schedule was pushed forward at least three times. For example, the "go live" date for the website or "storefront" portion of the project was initially scheduled for Fall 2007, but had to be rescheduled for several months later well into 2008. Even then, CW4 stated that there was no indication that the project's issues could be resolved in time to reach that goal. CW6 corroborated these reports, stating that even if Limited Brands had received a functional product by Fall 2007 (it had not), it would still take another *year* before the platform was interfaced and operational. Thus, defendants could not have reasonably believed that the n2N platform would be operational even by the end of 2008.

127.    Moreover, n2N's demonstrations for Limited Brands and VSD, beginning in June 2007, showed that the product was not functional. According to CW4, n2N's demonstrations, which several CWs have described as "embarrassing," were plagued by thousands of issues and "not even

- 45 -

close to workable." CW5 confirmed these reports, stating that the demonstrations were tailored to show pieces of a function, but none of the software actually worked.

128.     Further, according to CW5, Limited Brands tested n2N's deliverables using its own "HP Command Center" and documented the results and comments on a "Sharepoint" application. Limited Brands' tests identified many issues or defects plaguing the software's functionality, which were then documented in spreadsheet or Word format as a list under each function. These tests also revealed that the n2N software data was inconsistent and was being corrupted when used by an application. According to CW5, without consistent data, the software was not functional.

129.     Defendants' motive and opportunity also support an inference of scienter. According to Limited Brands' April 16, 2007 Proxy Statement, defendants' received substantial incentive compensation (*i.e.*, bonuses) based, in part, on Limited Brands' stock price. Thus, defendants were incentivized to inflate the Company's stock price in order to receive larger bonuses for themselves. Defendants also had the opportunity to commit the acts complained of herein, as they made the statements alleged to be misleading and/or participated in the drafting, preparation and approval of such statements, and had the opportunity and ability to prevent their issuance or cause them to be corrected.

130.     In addition, defendants, as senior executives of Limited Brands and VSD, can be presumed to have knowledge of adverse facts affecting the Company's business. According to defendants, VSD was Limited Brands "fastest growing channel," and the new DC and n2N initiatives were essential elements for its growth. As Limited Brands' CEO, CFO, CAO and Victoria's Secret's CEO and President, the Individual Defendants can be presumed to have knowledge of the adverse facts outlined throughout this Complaint affecting this core operation. Further, according to a December 12, 2007 *JP Morgan* report, defendant Wexner was "very involved in [Limited Brands'] strategic direction."

- 46 -

131.    Defendants were also aware of the problems with n2N based on their positions with n2N and their control of the venture and project.  Limited Brands was n2N's principal investor and *only* customer during the Class Period, and had substantial control over the venture.  Indeed, according to the GC Complaint, defendant Redgrave repeatedly stated "'[y]ou are us and we are you'" when referring to the relationship between Limited Brands and n2N, underscoring Limited Brands' control of n2N.  Limited Brands and VSD were also able to evaluate and negotiate directly with n2N's key vendors and represented to vendors that they "'should treat n2N as if it were Limited Brands.'"  In addition, Limited Brands was actively involved in the project and was responsible for substantial contributions, including providing n2N with design specifications, documentation and other development support and installing its own employees in key positions as the founders and leaders of n2N.  Based on their involvement and control of n2N, defendants can be presumed to have knowledge of the adverse facts outlined herein affecting the n2N project.  Moreover, defendants Turney and Redgrave, as directors of n2N during the Class Period, were ***directly informed*** of the problems affecting the project.

132.    The timing of the DC and n2N problems also supports an inference of scienter.  The problems affecting the DC and n2N projects continued to impact the Company into its 2007 fourth quarter, or the holiday season.  Limited Brands is heavily dependent on its fourth quarter, which typically accounts for over one third of its annual sales and the bulk of its operating income.  Any internal problems affecting this quarter would be of high importance to defendants.  Indeed, defendants admitted in the Company's 2007 Form 10-K that "[a]ny decrease in sales or margins during [the fourth quarter] could have a disproportionate effect on the Company's financial condition and results of operations."  Additionally, defendant Wexner admitted during an October 16, 2007 analysts' meeting that defendants entered 4Q07 "very clear eyed."  Thus, defendants can be

- 47 -

presumed to know of the significant problems outlined herein facing the Company during this quarter.

**LOSS CAUSATION/ECONOMIC LOSS**

133.    The market for Limited Brands' common stock was open, well-developed and efficient at all relevant times.  During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Limited Brands' common stock and operated as a fraud or deceit on Class Period purchasers of Limited Brands common stock by failing to disclose to investors the full extent of the ongoing and pervasive problems with the DC and n2N projects.  As a result of the materially false and misleading statements and omissions described above, Limited Brands' common stock traded at artificially inflated prices during the Class Period and until the truth began to be revealed to the market.  Had the true facts been disclosed, Limited Brands' stock price would have decreased substantially. Investors who purchased Limited Brands' stock at these fraud-inflated prices were damaged by paying too much as reflected in the price declines of Limited Brands' stock following the adverse disclosures detailed above.

134.    On November 8, 2007, the Company announced that the progress in ramping up capacity at the DC was slower than expected and that it was taking actions to reduce 4Q07 demand and sales.  As a result of this partial disclosure, Limited Brands' stock price fell over 13% in the next two trading days, to close at $17.94 on November 9, 2007.  The Company's stock price remained artificially inflated, however, due to defendants' false and misleading statements.

135.    On January 2, 2008, *TechCrunch* issued an article announcing that n2N was ceasing operations and that Limited Brands and VSD would not be using its technology.  Other articles issued the following day confirmed this announcement.  These articles disclosed, for the first time, the deterioration of the relationship between Limited Brands and n2N and the failure of the n2N

- 48 -

project. As a result of these disclosures, the Company's stock price fell over 18% over the following six trading days to close at $15.08 on January 9, 2008.

136. On February 28, 2008, defendants announced that the DC issues would not be resolved until June 2008 and that the Company would "continue to be negatively impacted by higher costs associated with lower accuracy levels running the DC and implementing the solutions" in 2008. As a result of these disclosures, the Company's stock price fell nearly 15% to close at $14.66 on February 29, 2008.

137. At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Limited Brands' IT initiatives and financial condition. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Limited Brands and its business, financial condition, prospects and operations, thus causing the Company's common stock to be overvalued and its price artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus leading to their losses when the deception was revealed and the market was able to accurately value the Company's shares.

## CLASS ACTION ALLEGATIONS

138. Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased Limited Brands common stock during the Class Period (the "Class"). Excluded from the Class are defendants, persons serving as officers and directors of the Company during the relevant time period, members of each of

their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any of the foregoing have or had a controlling interest.

139.    The members of the Class are so numerous that joinder of all members is impracticable. As of March 21, 2008, Limited Brands had more than 300 million shares of common stock outstanding, which were actively traded on the NYSE. While the exact number of Class members is unknown at the present time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed. Record owners and other members of the Class may be identified from records maintained by Limited Brands or its transfer agent, and members of the Class may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

140.    Plaintiff's claims are typical to the claims of all members of the Class. All members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein and have incurred substantial damages in connection therewith.

141.    Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are competent and experienced in both class action and securities litigation. Plaintiff has no interests which conflict with those of the Class members they seek to represent.

142.    Common questions of law and fact exist as to all Class members and predominate over any questions that may affect only individual Class members. Among the questions of law and fact common to the Class are:

(a)    whether defendants' acts, as alleged herein, violated the federal securities laws;

(b)      whether statements made by defendants to the investing public during the Class Period omitted and/or misrepresented material facts about Limited Brands' business, operations and financial performance;

(c)      whether defendants breached any duty to convey material facts or to correct material facts previously disseminated;

(d)      whether defendants participated in and pursued the fraudulent scheme or course of conduct complained of;

(e)      whether defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts;

(f)      whether the market price of Limited Brands' securities were artificially inflated during the Class Period due to the material misrepresentations and omissions complained of herein; and

(g)      whether the members of the Class have sustained damages and, if so, the appropriate measure of damages.

143.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

144.    Plaintiff relies, in part, on the presumption of reliance established by the fraud-on-the-market presumption.

145.    At all relevant times, the market for Limited Brands' common stock was an efficient market for the following reasons, among others:

- 51 -

(a)     Limited Brands' stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer, Limited Brands filed periodic public reports with the SEC and the NYSE that contained material misrepresentations and/or omitted material facts during the Class Period as alleged herein, causing Limited Brands stock to trade at artificially inflated prices;

(c)     Limited Brands regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)     Limited Brands was followed by several securities analysts employed by major brokerage firm(s), who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.  In writing these reports, analysts reflected information provided by defendants; and

(e)     the trading volume of Limited Brands common stock was substantial during the Class Period, indicating that there was a liquid market for Limited Brands common stock during the Class Period.

146.    As a result of the foregoing, the market for Limited Brands securities promptly digested current information regarding Limited Brands from all publicly available sources and reflected such information in Limited Brands' stock price.  Under these circumstances, all purchasers of Limited Brands common stock during the Class Period are entitled to a presumption of reliance because they all suffered similar injury through their purchase of Limited Brands' common stock at artificially inflated prices.

- 52 -

## NO SAFE HARBOR

147. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Most of the specific statements pleaded herein were not identified as and were not "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false or misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Limited Brands who knew that those statements were false when made.

## COUNT I

### For Violation of §10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

148. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is asserted against all defendants.

149. During the Class Period, Limited Brands and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and did: (a) deceive the investing public, including plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Limited Brands' common stock; and (c) cause plaintiff and other members of the Class to purchase Limited Brands' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, individually took the actions set forth herein.

530233_1

150. Defendants, either individually or as a group: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Limited Brands' securities in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All defendants are sued as primary participants in the wrongful and illegal conduct charged herein and as controlling persons, as alleged below.

151. In addition to the duties of full disclosure imposed on defendants as a result of their dissemination of affirmative statements, or participation in the making of affirmative statements to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X [17 C.F.R. §§210.01 *et seq.*] and SEC Regulation S-K [17 C.F.R. §§229.10 *et seq.*] and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market price of the Company's common stock would be based on truthful, complete and accurate information.

152. Defendants, individually and as a group, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Limited Brands as specified herein.

153. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Limited Brands' value and performance and continued substantial growth, which included the making of, or the participation in the making of,

- 54 -

untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about Limited Brands and its business operations and future prospects, in the light of the circumstances under which they were made, not misleading as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Limited Brands' common stock during the Class Period.

154. Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (a) he or she was a director and/or high-level executive at the Company during the Class Period and a member of the Company's management team; (b) by virtue of his or her responsibilities and activities as a senior officer of the Company, he or she was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans and projections and/or reports; (c) he or she enjoyed significant personal contact and familiarity with the other defendants and was advised of or had access to other members of the Company's management team, internal reports and other data and information about the Company's business finances and operations at all relevant times; and (d) he or she was aware of the Company's dissemination of information to the investing public, which he or she knew or recklessly disregarded, was materially false and misleading.

155. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Defendants' material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing Limited Brands' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. If defendants did not have actual knowledge of the misrepresentations and omissions alleged, they were at the very

- 55 -

least reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

156.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Limited Brands' securities was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of Limited Brands' securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Limited Brands securities during the Class Period at artificially inflated prices based on their reliance.

157.    As alleged herein, the market prices of Limited Brands' securities declined materially when the truth concerning Limited Brands' financial prospects and business, which had been concealed by defendants' material misrepresentations and omissions, was disclosed, causing plaintiff and the other members of the Class substantial damages.

158.    At the times, defendants disseminated the misrepresentations and omissions complained of herein, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Limited Brands, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Limited Brands' shares, or, if they had acquired such shares during the Class Period, they would not have purchased them at the artificially inflated prices which they paid.

159.    By virtue of the forgoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

160.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against all defendants.

161.     The Individual Defendants were and acted as controlling persons of Limited Brands within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with Limited Brands, their ownership and contractual rights, their participation in and/or awareness of the Company's operations, and/or their intimate knowledge of the Company's actual performance and undisclosed problems, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

162.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised same.  In addition, defendant Wexner owned 12.8% of Limited Brands' common stock and controlled the Company through his substantial stock ownership.

163.     Limited Brands controlled the Individual Defendants and all of its employees.

164.     As set forth above, Limited Brands and the Individual Defendants violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, defendants are liable to plaintiff and the other members of the Class pursuant to

- 57 -

§20(a).  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER

WHEREFORE, plaintiff, individually and on behalf of the Class, prays for judgment as follows:

A.       Determining that this action is a proper class action and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.       Awarding compensatory damages in favor of plaintiff and the other members of the Class against all defendants, jointly and severally for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.       Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.       Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:  June 25, 2010                    ROBBINS GELLER RUDMAN
                                                             & DOWD LLP
                                                        HENRY ROSEN


                                                        _____s/ HENRY ROSEN_____
                                                                 HENRY ROSEN

                                                        655 West Broadway, Suite 1900
                                                        San Diego, CA  92101
                                                        Telephone:  619/231-1058
                                                        619/231-7423 (fax)
                                                        E-mail:  henryr@rgrdlaw.com

- 58 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
SARAH R. HOLLOWAY
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail:  sholloway@rgrdlaw.com

Lead Counsel Plaintiff

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY (0063373)
GEOFFREY J. MOUL (0070663)
BRIAN K. MURPHY (0070654)
326 S. High Street, Suite 400
Columbus, OH 43215
Telephone:  614/488-0400
614/488-0401 (fax)
E-mail:  murphy@mmmb.com

Liaison Counsel

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 25, 2010, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to the e-mail

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on June 25, 2010.

s/ HENRY ROSEN
HENRY ROSEN

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:henryr@rgrdlaw.com

## Mailing Information for a Case 2:09-cv-01008-EAS -MRA

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Deborah Clark-Weintraub**
  dweintraub@wdklaw.com

- **Charles S Duggan**
  charles.duggan@davispolk.com

- **Dennis E Glazer**
  dennis.glazer@davispolk.com

- **Sarah R Holloway**
  sholloway@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Thomas S Kilbane**
  tkilbane@ssd.com

- **Elisha J Kobre**
  elisha.kobre@davispolk.com

- **Geoffrey J Moul**
  moul@mmmb.com,tiffany@mmmb.com,osborn@mmmb.com

- **Brian K Murphy**
  murphy@mmmb.com,tiffany@mmmb.com

- **Joseph F Murray**
  murray@mmmb.com,tiffany@mmmb.com

- **Joseph P Rodgers**
  jrodgers@ssd.com

- **Henry Rosen**
  henryr@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David Avi Rosenfeld**
  drosenfeld@csgrr.com

- **Samuel H Rudman**
  srudman@csgrr.com

- **Patrick J Sheehan**
  psheehan@wdklaw.com

- **Keith Shumate**
  kshumate@ssd.com,cle_dckt@ssd.com,asawyer@ssd.com,cbell@ssd.com

- **Joseph C Weinstein**
  jweinstein@ssd.com,rhaffke@ssd.com,tcarroll@ssd.com,cvillicana@ssd.com,cle_dckt@ssd.com,srathke@ssd.com,dwingenfeld@ssd.com

- **Joe R Whatley , Jr**
  jwhatley@wdklaw.com,ecf@wdklaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)