## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS LOCAL
697 PENSION FUND, Individually and
on Behalf of All Others Similarly
Situated,

                Plaintiff,

    v.

LIMITED BRANDS, INC., et al.,

                Defendants.

Case No. 2:09-cv-1008

JUDGE SARGUS

MAGISTRATE JUDGE ABEL

### OPINION AND ORDER

This matter is presently before the Court on Defendants' Motion to Dismiss the Amended

Class Action Complaint with Prejudice (Doc. 36). For the reasons stated herein, the motion is

**GRANTED**.

### I.

Plaintiff[1] brings the instant securities-fraud class action against Defendants Limited

Brands, Inc. ("Limited"), Leslie H. Wexner ("Wexner"), Stuart B. Burgdoerfer ("Burgdoerfer"),

Martyn Redgrave ("Redgrave"), and Sharen Turney ("Turney"). Limited is a Delaware

corporation headquartered in Columbus, and specializes in the sale of women's intimate apparel,

beauty and personal care products, and accessories through various subsidiaries including Bath

& Body Works and Victoria's Secret. (Am. Compl. ¶ 19.) Wexner is the founder, Chairman,

and Chief Executive Officer of Limited. (Am. Compl. ¶ 20.) Burgdoerfer is Limited's Chief

Financial Officer. (Am. Compl. ¶ 21.) Redgrave is Limited's Chief Administrative Officer.

---

[1] By Order dated April 5, 2010, the Plumbers and Pipefitters Locals 502 & 633 Pension Trust Fund was appointed
lead Plaintiff in this matter. (Doc. 30.)

(Am. Compl. ¶ 22.) Finally, Turney is the Chief Executive Officer and President of Victoria's Secret Megabrand and Intimate Apparel. (Am. Compl. ¶ 23.)

The claims brought by Plaintiff primarily relate to Victoria's Secret Direct ("VSD"), the internet and catalog sales arm of Victoria's Secret. According to Plaintiff, between August 22, 2007 and February 28, 2008 ("class period"), Defendants made a series of false or misleading statements concerning two separate, but related initiatives at VSD. The first of these initiatives was the development of a new "front-end" software system that would, *inter alia*, "enable VSD to interact with customers in real-time through online merchandising displays and email promotions." (Am. Compl. ¶ 40.) This system was intended to replace VSD's older system, which had become obsolete as VSD's business had increased. (Am. Compl. ¶ 40.) Instead of developing the system internally, Limited partnered with General Catalyst, a private equity firm, to launch a joint venture dubbed "n2N" to develop the software system for VSD, with the goal of marketing similar systems to other retailers. (Am. Compl. ¶ 41.) Turney and Redgrave were on the board of directors of n2N. (Am. Compl. ¶¶ 22, 23.) General Catalyst and Limited initially invested $19.8 million and $10.6 million respectively in the n2N venture, which was incorporated in June 2006. (Am. Compl. ¶¶ 41, 44.) Limited contributed another $7.5 million in financing to n2N in November 2007, but the venture ultimately was closed in December 2007 without having successfully developed the new front-end system. (*See* Am. Compl. Ex. B at 4–6.) According to Plaintiff, however, during the class period, Defendants' statements concerning n2N misled the investing public into believing that the software system was being successfully implemented and would contribute to the profitability of VSD, when, in fact, the project was plagued by significant development problems of which Defendants were aware.

The second initiative was the opening of a new distribution center for VSD in August 2007. (*See* Am. Compl. ¶ 45.) According to Plaintiff, in the months before its opening, Defendants had touted the new distribution center (along with n2N) as a key strategic initiative that would help to drive down costs and increase profit margins. However, upon opening, the distribution center was beset with operational problems. Plaintiff alleges that throughout the class period, Defendants failed to disclose the true extent of these problems in an attempt to keep Limited's stock price at an artificially high level.

Plaintiff's allegations are supported by the statements of six confidential witnesses integrated into the amended complaint. Confidential Witness 1 ("CW1") is described as a former "Associate Merchandise Planner at VSD from May 2007 to February 2008." (Am. Compl. ¶ 31.) According to Plaintiff, in November 2007, CW1 was assigned to a special team tasked with fixing the problems at the new distribution center. (Am. Compl. ¶ 31.) CW2 is described as a "Business Relation Executive (an IT position) in the Victoria's Secret Stores Retail Division from October 2005 to March 2009." (Am. Compl. ¶ 32.) According to Plaintiff, pursuant to his or her job responsibilities, CW2 had direct contact with persons working on information technology issues at the new distribution center. (Am. Comp. ¶ 32.)

CW3 "was a Director of Technology at VSD from 2000 to May 2009. In this position, CW3 was responsible for the integration of the n2N system with Limited Brands and for building, installing and implementing the interface and processing large volumes of data interchanged between Limited Brands and n2N." (Am. Compl. ¶ 33.) CW4 "held various high-level IT jobs at Limited" including Director of Technology Delivery at VSD during the class period. (Am. Compl. ¶ 34.) According to Plaintiff, CW4 headed a team "that worked on upgrading the VSD website as part of the new n2N platform." (Am. Compl. ¶ 34.) CW4

reported to Donna Ruch ("Ruch"), Senior Vice President of Victoria's Secret information technology, who herself reported directly to Redgrave and Turney. (Am. Compl. ¶ 34.)

CW5 was "an Internet Manager at VSD from November 2006 to August 2007." (Am. Compl. ¶ 36.) In this position, CW5 worked on "business processes for the n2N platform and attended daily n2N meetings." (Am. Compl. ¶ 36.) Finally, CW6 is alleged to have held various high-level information technology jobs with Limited, including Financial Systems Manager at VSD during the class period. (Am. Compl. ¶ 38.) In this position, CW6 also worked on the n2N project and had direct communications with high-level technical managers at n2N. (Am. Compl. ¶ 38.)

## II.

Plaintiff brings claims pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, codified as amended at 15 U.S.C. §§ 78j(b) & 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. Section 10(b) makes it unlawful:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Section 20(a) establishes instances in which individuals controlling others who have violated the Securities Exchange Act can be deemed personally liable. *See id.* § 78t(a). Rule 10b-5, issued by the SEC pursuant to § 10(b), provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To establish a cause of action under Rule 10b-5, a Plaintiff must plead the following six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

Defendants move to dismiss the amended class action complaint for failing to state a claim pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act ("PSLRA").

"A claim survives [a Rule 12(b)(6) motion] where its '[f]actual allegations [are] enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true.'" *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007)). "[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Twombly*, 550 U.S. at 563 n.8. The court must also "construe the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). Furthermore, "[a]lthough for purposes of a motion to dismiss [a court] must take all the factual allegations in the complaint as true, [it] [is] not bound to accept as true a legal

conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949–50 (2009)
(quoting *Twombly*, 550 U.S. at 55) (internal quotations omitted).

Courts must also keep other pleading requirements in mind when considering a motion to
dismiss claims governed by the PSLRA. For instance, securities cases based on fraud remain
subject to the heightened pleadings requirements of Rule 9(b). *See La. Sch. Emps.' Ret. Sys. v.
Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010). Additionally, the PSLRA itself contains
heightened pleading requirements for several elements of a Rule 10b-5 action. In such actions,
the PSLRA requires a plaintiff's complaint to "specify each statement alleged to have been
misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding
the statement or omission is made on information and belief, the complaint shall state with
particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA also
specifies that:

> in any private action arising under this chapter in which the plaintiff may recover
> money damages only on proof that the defendant acted with a particular state of
> mind, the complaint shall, with respect to each act or omission alleged to violate
> this chapter, state with particularity facts giving rise to a strong inference that the
> defendant acted with the required state of mind.

*Id.* § 78u-4(b)(2)(A). Accordingly, as to the scienter element of Plaintiff's Rule 10b-5 claim, the
amended complaint must state facts that give rise to a strong inference of a fraudulent intent on
the part of Defendants.

### III.

The Court will now discuss in detail the series of statements that Plaintiff alleges were
false or misleading, and the facts that Plaintiff contends support these allegations. These
statements were made by Defendants on fourteen different occasions throughout the class period.
The occasions include, in chronological order: a press release discussing Limited's second

6

quarter financial results issued by the company on August 22, 2007; an August 23, 2007 conference call with analysts to discuss the second quarter results; a presentation at a global retailing conference on September 5, 2007; a recorded message reporting Limited's August 2007 sales released on September 6, 2007; a press release issued by n2N on September 17, 2007; an interview given by Turney that appeared in a magazine sometime in October 2007; the recording summarizing September 2007 sales released on October 11, 2007; a presentation to analysts by Wexner on October 16, 2007; a presentation at the "3rd Annual Consumer Focus Forum" on October 25, 2007; the October 2007 sales results recording that was released on November 8, 2007; a November 20, 2007 conference call with analysts to discuss third quarter earnings; the November 2007 sales results recording that was released on December 6, 2007; the December 2007 sales results recording that was released on January 10, 2008; and the January 2008 sales results recording that was released on February 7, 2008.

Turning first to the August 22, 2007 press release, Plaintiff alleges that the following statement was false or misleading: "*[Limited] stated that it is comfortable with the current First Call consensus earnings per share estimates for the third and fourth quarters of $0.04 and $1.18, respectively. This outlook includes the impact of all the previously announced transactions and initiatives and our view of fall business performance.*"[2] (Doc. 36, Ex. C at 2.) The Press Release, which is attached as an exhibit to Defendants' motion to dismiss,[3] contained a

---

[2] Statements or portions of statements that Plaintiff alleges were false or misleading will appear in bold and italics throughout. In places, the amended complaint only excerpts small quotations from lengthier statements. However, in many instances *infra*, the Court will include larger quotations from the statements at issue so that the full context of these statements is made apparent.

[3] When deciding a 12(b)(6) motion, the Court may consider materials beyond the complaint if they "are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." *Ley v. Visteon Corp.,* 543 F.3d 801, 805 (6th Cir. 2008) (quotation and citation omitted). In particular, the court can consider documents incorporated into the complaint by reference. *Bowers v. Wynne,* 615 F.3d 455, 470 (6th Cir. 2010) (citing *Tellabs, Inc v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007)). The Sixth Circuit has held that

lengthy disclaimer about forward-looking statements that the Court reproduces in its entirety

below:

> The Company cautions that any forward-looking statements (as such term is defined in the Private Securities Litigation Reform Act of 1995) contained in this press release or the Second quarter earnings call or made by the Company or management of the Company involve risks and uncertainties and are subject to change based on various important factors, many of which are beyond our control. Accordingly, the Company's future performance and financial results may differ materially from those expressed or implied in any such forward-looking statements. Words such as "estimate," "project," "plan," "believe," "expect," "anticipate," "intend," "planned," "potential" and similar expressions may identify forward-looking statements. The following factors, among others, in some cases have affected and in the future could affect the Company's financial performance and actual results and could cause actual results to differ materially from those expressed or implied in any forward-looking statements included in this press release or the Second quarter earnings call or otherwise made by the Company or management: risks associated with general economic conditions, consumer confidence and consumer spending patterns; the potential impact of national and international security concerns on the retail environment, including any possible military action, terrorist attacks or other hostilities; risks associated with the seasonality of the Company's business; risks associated with the highly competitive nature of the retail industry generally and the segments in which we operate particularly; risks related to consumer acceptance of the Company's products and the Company's ability to keep up with fashion trends, develop new merchandise, launch new product lines successfully, offer products at the appropriate price points and enhance the Company's brand image; risks associated with the Company's ability to retain, hire and train key personnel and management; risks associated with the possible inability of the Company's manufacturers to deliver products in a timely manner or meet quality standards; risks associated with the Company's reliance on foreign sources of production, including risks related to the disruption of imports by labor disputes, risks related to political instability, risks associated with legal and regulatory matters, risks related to duties, taxes, other charges and quotas on imports, risks related to local business practices, potential delays or disruptions in shipping and related pricing impacts and political issues and risks related to currency and exchange rates; risks associated with the dependence on a high volume of mall traffic and the possible lack of availability of suitable store locations on appropriate terms; risks associated with labor shortages or increased labor costs; risks associated with increases in the costs of mailing, paper and printing; risks associated with our ability to service any debt we incur from time to time as well as the requirements

"[t]his Court may consider the full text of the SEC filings, prospectus, analysts' reports, and statements 'integral to the complaint,' even if not attached, without converting the motion into one for summary judgment." *Bovee v. Coopers & Lybrand, C.P.A.*, 272 F.3d 356, 360–61 (6th Cir. 2001).

the agreements related to such debt impose upon us; risks associated with the Company's reliance on information technology, including risks related to the implementation of new information technology systems and risks related to utilizing third parties to provide information technology services; risks associated with severe weather conditions, natural disasters or health hazards; risks associated with rising energy costs; and risks associated with independent licensees. The Company is not under any obligation and does not intend to make publicly available any update or other revisions to any of the forward-looking statements contained in this press release or the Second quarter earnings call to reflect circumstances existing after the date of this report or to reflect the occurrence of future events even if experience or future events make it clear that any expected results expressed or implied by those forward-looking statements will not be realized.

(Doc. 36, Ex. C at 2.)

During the August 23, 2007 earnings conference call, Plaintiff alleges that several false or misleading statements were made by Burgdoerfer, Redgrave and Turney. During his portion of the presentation, Burgdoerfer reiterated that "*we are comfortable with the current First Call consensus earnings estimates of $0.04 for the third quarter and $1.18 for the fourth quarter.*" (Am. Compl. ¶ 54.) Redgrave announced that Limited had "*just opened a brand-new distribution center to support the growth of both the existing Victoria's Secret direct business and the new Bath & Body Works direct business.*" (Am. Compl. ¶ 55.) During the call, Turney stated: "Of the operating income dollar decline, slightly more than 40% related to the anticipated expenses associated with our new distribution center and upgraded technology. *These investments support the future growth of our direct business.*" (Doc. 36, Ex. D at 5.) With regard to the distribution center, Turney further stated:

> *We are pleased that our new state of the art distribution center opened in August, and that the new 1 million square foot distribution center will support the long-term expansion of the direct channel. The new DC has capacity to handle over 40% more volume than our old DC.*
>
> We are still currently in the midst of a controlled start of the new distribution center, while we continue to work through *normal implementation issues*, we are

> expected—we are excited about the expanding capabilities, the new facility will
> provide us, from an operational perspective.

(Doc. 36, Ex. D at 6.) At the start of the conference call, Tom Katzenmeyer ("Katzenmeyer"), a

Limited Senior Vice President, stated that, "As always, a reminder, any forward-looking

statements we may make today are subject to the Safe Harbor statement found in our SEC

filings." (Doc. 36, Ex. D at 1.) According to Plaintiff, the positive news reflected in the August

22nd press release and August 23rd earnings call caused Limited's stock to increase by 6.47% on

August 23, 2007. (Am. Compl. ¶ 56.)

Plaintiff alleges that the statements in the press release and earnings call of the following

day were false and misleading because Defendants knew by August 22nd that the distribution

center was experiencing significant operational and software problems that were causing errors

in shipments. (Am. Compl. ¶ 58.) According to CW6, Limited had failed to properly test the

distribution center before opening it. (Am. Compl. ¶ 58.) CW4 stated that the problems were so

substantial, in the months following the startup, the output of the new distribution center was less

than that of the old distribution center. (Am. Compl. ¶ 58.) A special team had to be established

to focus on the problems at the center. (Am. Compl. ¶ 58.) Finally, Plaintiff alleges that, as of

the time the above statements were made, the n2N project was experiencing significant

problems, and it was clear by August 2007, at least to CW4, that the software was not going to

work. (Am. Compl. ¶ 59.) According to Plaintiff, as a result of these problems, the estimates

made by Defendants of $.04 earnings per share in the third quarter and $1.18 earnings per share

in the fourth quarter "lacked reasonable basis." (Am. Compl. ¶ 60.)

On September 5, 2007, Plaintiff alleges that Katzenmeyer gave the following allegedly

false or misleading statements at the 14th Annual Global Retailing Conference:

10

> We also think we have *significant growth opportunities* in internet and the
> internet and catalog business. And we're investing in new front-end internet and
> call center systems from all our direct channel businesses at this point in time. *In
> fact, we just opened a brand new distribution center to support that growth in
> Columbus.* That happened in the month of August. *We also have major
> technology initiatives going on in the supply chain, shared services, and
> customer relationship marketing area.*

(Am. Compl. ¶ 61.)

During the September 6, 2007 recorded report of August 2007 sales, Amie Preston

("Preston"), Vice President of Investor Relations, made the following allegedly false and

misleading statements:

> Turning to Victoria's Secret Direct—as you know, we transitioned to a new
> distribution center in August. As a result we experienced delays in shipment
> times. While we anticipated some delay, it is taking longer than we initially
> anticipated to get the new DC to full capacity and as a result the ship time is
> currently longer than we anticipated. Demand from customers as measured by
> orders received was roughly flat for the month of August. However, sales are not
> recognized until orders are received by customers. As a result of the shipping
> delays Victoria's Secret Direct net sales were down 64% to last year in August.
>
> *At this time we anticipate that the DC will be operating under normal ship times
> by the end of September and we expect a significant increase in September sales
> versus last year as we clear the current backlog.* The August gross margin rate
> was down significantly at Victoria's Secret Direct and below expectations due to
> incremental costs associated with upgrading shipments to customers and labor
> costs to stabilize the DC operations.

(Am. Compl. ¶ 62.) The September 6th recording was prefaced by the following qualifier: "As a

matter of formality I need to remind you that any forward-looking statements I may make today

are subject to the Safe Harbor statement found in our SEC filings." (Doc. 36, Ex. E at 1.)

According to Plaintiff, the statements in the September 6th call were misleading because

the operational problems at the distribution center were much more severe than Defendants

disclosed. Accordingly, Plaintiff alleges that Defendants knew that ship times would not be

normal by the end of September. (Am. Compl. ¶ 63.)

On September 17, 2007, n2N issued a press release stating that "***Victoria's Secret Direct will begin running its $1.4 billion business on n2N's platform in early 2008.***" (Am. Compl. ¶ 64.) According to Plaintiff, Defendants had the ability to amend or correct this statement, but failed to do so.

Turney gave an interview in the October 2007 edition of Apparel Magazine in which she allegedly made several false and misleading statements regarding n2N. First, she stated that n2N software would allow Limited to "***double***" its direct sales in five years. (Am. Compl. ¶ 65.) She further added that "***Overall, we're very excited about the implementation. It's going to add a lot of value to our business. We're very dedicated to it. We've got a lot of people focused on it, and I think it is going to set us up for growth for the future.***" (Am. Compl. ¶ 65.) Finally, during the interview, the following exchange regarding implementation of the software occurred:

> [Apparel Magazine]: What challenges have you encountered, if any, so far in your testing and implementation process? What has been the company's experience from the perspective of change management?
>
> [Sharon [sic] Turney]: You know, it's interesting. The teams have really worked very closely together in terms of change management. Everybody is pretty excited about how much more efficient everything will be. As far as the testing goes, ***there've been the normal glitches, but nothing major.***

(Am. Compl. ¶ 65.) According to Plaintiff, the statements in the n2N press release and Turney's interview were false and misleading because the many problems allegedly being encountered at that time with the development of the n2N system meant that Defendants could not reasonably have believed that the software would be operational prior to 2008. (*See* Am. Compl. ¶ 66.)

In the October 11, 2007 recorded report of September sales, Plaintiff alleges that Preston made the following false or misleading statements:

> Retail inventories consisting of Victoria's Secret and Bath & Body Works ended the month down 10% versus last year on a per square foot basis at cost. We now

12

expect third-quarter earnings per share to be between $0.00 and $0.04 per share versus our previous expectation of $0.04 per share.

. . .

Turning to Victoria's Secret Direct, as you know, *we transitioned to a new distribution center in August* and experienced delays in ship times in August and into September. August sales were down 64% as a result. *We made significant progress in September* and sales were up 27% to last year. *The distribution center is now operating under normal ship times and we are targeting to offer the full range of shipping options including one day by the end of October.* The September merchandise margin rate was roughly flat to last year.

(Doc. 36, Ex. G at 1–2.) This sales recording was also prefaced by the qualifier regarding

forward-looking statements. (*See* Doc. 36, Ex. G. at 1.) According to Plaintiff, however, the

distribution center was not operating under normal ship times by October 11th due to the severe

operational problems it was facing. (*See* Am. Compl. ¶ 69.)

On October 16, 2007, Wexner delivered a presentation to analysts in which he made the

following allegedly false and misleading statements:

*I think we are better led and better planned than we have ever been going into holiday for many years. . . . We are drastically better planned than last year. . . .* There is no overhang or distractions from systems installations, inventory is reduced in line and we don't see *any* inventory problems. If the inventory and the merchandise have been thoughtfully planned – hopefully it is and will be desired by our customers – I think we could and should have a very good holiday and hopefully we will get more of our fair share. *We enter into it very clear eyed, very controlled, very disciplined and very well thought out in our merchandising.*

(Am. Compl. ¶ 70.) Additionally, Wexner described Limited's planning as "*conservative,*

though we didn't pull in our horns completely. It's sounder but still conservative. . . . *I feel very*

*confident and very much at ease going into this holiday season.*" (Am. Compl. ¶ 70.)

In a presentation to the 3rd Annual Consumer Focus Forum on October 25, 2007,

Katzenmeyer and Preston stated that "*we're targeting 12% plus growth in earnings per share*

and we have several opportunities for growth across both of our businesses." (Am. Compl. ¶

72.)

In the November 8, 2007 recorded report on October 2007 sales, Preston made the

following allegedly false and misleading statements:

> Turning to Victoria's Secret Direct, as we've previously communicated, we
> transitioned to a new distribution center in early August and experienced delays in
> ship times in the third quarter. August sales were down 64% and September sales
> were up 27% as we cleared through some of the August backlog. August and
> September margins were also negatively impacted due to incremental costs to
> stabilize the DC and upgrading shipments to customers.
>
> October sales were up 5% to last year, driven by record-breaking redemptions of a
> $25 off apology offer that was sent to customers who were adversely affected by
> the DC operational issue. The merchandise margin rate was down significantly in
> October, driven by the impact of not offering upgraded shipping and the $25
> promotional offer.
>
> Third-quarter sales at Victoria's Secret Direct were $225 million, down 7% to last
> year.
>
> Our progress in ramping up capacity at the DC has been slower than expected.
> Although *demand remains very strong*, we want to insure that we don't
> disappoint our customers. And, therefore, we have taken actions, including
> reducing catalog circulation which will significantly reduce fourth-quarter
> demand and sales.

(Doc. 36, Ex. I at 2.) This recording also included the same prefatory language regarding

forward-looking statements as the previous sales report recordings. (*See* Doc. 36, Ex. I at 1.)

According to Plaintiff, following the release of this sales results recording, Limited stock fell

over 13% during the next two trading days. (Am. Compl. ¶ 74.)

On November 20, 2007, Limited issued a press release regarding its third quarter sales

results. This press release contained the following statement:

> The company stated that it now expects negative mid-single digit comparable
> store sales for November, versus its previous guidance for flat comparable store
> sales. It also expects fourth quarter earnings per share of $0.90 to $1.05 versus
> $1.08 last year. The decline versus its previous guidance reflects issues related to

14

the opening of a new distribution center for Victoria's Secret Direct and the challenging overall retail environment. Last year's earnings per share results include approximately $0.04 related to the 53rd week.

(Doc. 36, Ex. J. at 1.)  The press release also included similar warning language concerning forward-looking statements as the August 22, 2007 press release, with the addition of specific language concerning the distribution center: "risks associated with the Company's reliance on information technology, including risks related to the implementation of new information technology and distribution systems, including risks associated with our new Victoria's Secret Direct distribution center."  (Doc. 36, Ex. J. at 2.)

On November 20, 2007, Defendants also conducted a conference call with analysts to discuss third quarter results.  During that call, several allegedly false and misleading statements were made by Turney and Redgrave.  Redgrave stated the following:

> We are also investing in a new distribution center and new front end technology to support the growth of our Victoria's Secret direct business. As you know, we opened the new distribution center for Victoria's Secret Direct in early August. As we described in our October sales call, it has taken us longer than we had anticipated to ramp up this new DC to full capacity. This has had a negative impact on our third quarter results, and we now expect that it will have an even more negative impact on our fourth quarter results. Stuart and Sharen will discuss the financial impact more specifically, but I thought it would be helpful to provide you with an overview of this situation.

> The former direct distribution center was built back in 1992 when the business was doing less than $400 million in volume. The business is now $1.4 billion, and we have been experiencing capacity issues in the last two holiday seasons. As a result, we recognize that we could not support the growth of the direct business with the existing DC. When we planned the new DC that would support the growth of our direct business for the next decade, we invested in a new physical facility, systems, material handling equipment and processes, that represent the best practices that are being used in direct distribution.

> While many of the systems and processes we are using in the new DC have been employed before in other centers, the way in which these systems are integrated is a unique combination, due to the high unit velocity and the range of SKU diversity in our direct business. The fact is that the hard change over the new integrated processes, mechanical equipment, and IT systems is taking us longer

15

than expected to stabilize. We appear to have hit a limit on how much we can process through the new center and we need to be able to substantially increase our throughput to serve the volumes that we expect for holiday and January's semi annual sale.

*Direct demand at Victoria's Secret remains very strong* and we want to ensure that we don't disappoint our customers. Therefore we have taken actions to constrained [sic] the volume of orders we will take, including reducing catalog circulation, which will significantly reduce fourth quarter direct demand and sales. Now, *getting the direct DC up to full capacity is without question the most significant operational priority that we have.* We have our best internal people, as well as outside vendor experts and independent experts evaluating the situation, and we are looking at a range of options to make changes.

As we have previously discussed, we also have two other significant technology projects under way. As a result of the challenges that we've experienced with both the implementation of the supply chain systems at Bath & Body Works and the new direct distribution center, *we are reevaluating the approach and timing of* the supply chain systems rollout to Victoria's Secret and Mast and *the development of the new front end technologies systems at Victoria's Secret direct.*

Our number one business priority is to remain very focused on executing the best possible fourth quarter and holiday. Although we anticipate that the external environment will remain challenging and we will be negatively impacted by the issues at the Victoria's Secret direct distribution center, we do believe that our brands are *very strong* and that we are *very well positioned* with respect to our assortment, our inventory levels and expense discipline.

(Doc. 36, Ex. B at 2–3.) Later, Turney stated the following:

Now, turning our attention to the Direct channel, as Martyn and Stuart mentioned, our results at Direct were negatively impacted by the delays in shipping out of our new distribution center. *Demand for the brand*, as evidenced by our orders from the catalog and the Internet channel, *remain* [sic] *very strong*, but sales at Direct declined 7% in the quarter, due to the increased ship times and operating income decline significantly. The decline in operating income was a result of sales and related shipping and handling revenue decline. The loss of higher margin, expedited shipping options and incremental labor hired to staff the DC and work on fixing the issue. We are obviously disappointed that we've had to take steps to reduce this demand in the fourth quarter. However, protecting the customer experience and her satisfaction with the brand is of paramount importance. As Martyn said, *this is our most significant operational priority* and we are working very hard to bring the DC up to full capacity and maintain customer satisfaction. Thank you, and I'll now turn it over to Diane.

(Doc. 36, Ex. B at 5.)

The following exchange concerning the distribution center occurred during the question

and answer portion of the conference call:

> JEFF BLACK, ANALYST, LEHMAN BROTHERS: Thanks, good afternoon,
> everybody. I guess just a question on the magnitude and depth of the problem at
> the DC. I mean is this a full reengineering effort we have to undertake here? And
> what are the chances this extends beyond 4Q and into spring, would be, A. Then
> on the Victoria's Secret systems implementation, assuming you probably don't
> want to do that next fall, is that going to slip into '09? Thank you very much.

> TOM KATZENMEYER: Thanks, Jeff. We're going to go to Martyn Redgrave
> with your question.

> MARTYN REDGRAVE: Jeff, in terms of the distribution center operation, just to
> step back and give you a little bit more perspective, because I'm sure this will be a
> source of a number of questions, the first thing I think you need to understand is
> in opening the center in August, *we had expected a slow ramp up. We did in fact
> ramp up at about the pace that we were expecting to ramp up at, to about the
> end of September and into October.* We saw a noise, if you will, in the operation
> of the center, but *we didn't see an inability to break through the volume levels
> that we need to break through to service holiday.*

> Over the last four weeks, as we've evaluated the performance of the center, we've
> concluded that there are some issues there that are going to cause us to have to
> limit the capacity of the center—that will limit the capacity of the center as we
> enter into holiday. The center itself obviously is a new operation for us. For
> instance, it utilizes a number of new capabilities that we've not had in our other
> distribution centers before, things like the high pay reserve storage capabilities
> that are not in our other centers. We're using a dynamic location picking system,
> which is very different than the static location picking systems that our traditional
> centers have used. We're using new high speed multiple stage conveyor systems,
> new handheld and laser reading scanning technologies. All of this is kind of new
> to us, not necessarily new to the world in terms of the way it's been utilized in
> other large scale distribution centers, but are just taking us longer than we had
> expected to kind of burn in these new processes, these new systems, and make
> sure that our associates in our distribution center fully understand how to utilize
> the new processes and systems

> Another point that I would give you as perspective is that *the center right now is
> operating at about 70 to 75% of our targeted capacity. In other words, the
> capacity we would need to be at to fully service holidays.* So that gives you a
> sense of the gap. And the last thing I would say, and I would be happy to answer
> more questions about this, is that we are obviously focused on stabilizing the

systems, the processes, and the, and ensuring that our people are properly trained to operate these new systems and processes. We're working on all aspects of that on a very realtime basis with internal and outside experts, and at this stage, it's premature to say how long it's going to take to fully stabilize the center and whether or not it's going to have an impact on the spring. We do expect it will have some impact, though.

TOM KATZENMEYER: Martyn, he had a follow-on question about the systems at Victoria.

MARTYN REDGRAVE: Well, as I mentioned in the scripted remarks, we're evaluating the timing of the limitation of the supply chain systems for Victoria's Secret stores. *It's important to distinguish that on one hand we're talking about the Victoria's Secret Direct business, that's the distribution center. On the other hand, which is a completely separate organization and operation, is our store's operation, which is scheduled to implement the supply chain systems next year.* As I indicated, we're reevaluating the timing of that implementation, particularly as we look at the other priorities that we have to deliver against and it is probable *that* we will change that timing in order to not disrupt the Victoria's Secret Stores business in 2008.

JEFF BLACK: Without belaboring it, the system as it stands now and with the 70% capacity could handle spring volume or no?

MARTYN REDGRAVE: *Could handle spring volume,* but not semi annual sales peak volumes.

(Doc. 36, Ex. B at 6–7.)

Later, the following exchange concerning issues associated with limiting VSD demand

during the holiday season occurred:

JEFF STEIN, ANALYST, KEYBANC CAPITAL MARKETS: Okay. Well, this question's probably a little premature, but I'm just kind of curious how you go about ramping a business, or ramping back up a business like Victoria's Secret Direct after slowing it down. In other words, do you envision a steep ramp or are you, or once you get the business stabilized, will you be more inclined to try to produce a soft ramp?

TOM KATZENMEYER: Jeff, we're going to go to Sharen Turney for that.

SHAREN TURNEY: Basically this timeframe, this is when we really peak the business, around the holiday and semi annual sale. As we've come out of semi annual sea, the normal business subsides down to, all the way until we get back into semi annual. The piece that we feel very confident in terms of the product.

18

*The product demand has been very strong at Direct.* We continue to see that opportunity in the spring season. The one caution that you have is the fact that we won't be driving the file and the growth of the file as we have in the past. We're being very strategic with the contact strategy. We're just not contacting the customers as frequently as we had in the past, and in our Spring plan is around a contact strategy and going back out to those customers at a more frequent basis, both by catalog, as well as an e-mail strategy.

JEFF STEIN: Sounds like it's kind of a soft ramp, would that be correct?

SHAREN TURNEY: Well, I don't—the thing about it is, *you're not really having to ramp up because you're coming out of a peak timeframe, where it, normally the volume drops. So because the volume drops, that distribution center will be able to handle that volume.* It's just, it's like can we get the labor corrected within that from a profit flow-through perspective.

JEFF STEIN: Got it. Thank you.

(Doc. 36, Ex. B at 9.)

As with the August 23rd call, Katzenmeyer began the November 20th earnings call with a disclaimer concerning forward-looking statements. (*See* Doc. 36, Ex. B at 1.) According to Plaintiff, following the "positive reassurances" given by Defendants during the November 20th call, Limited's stock price increased 7% over the next two days. (Am. Compl. ¶ 83.)

During the December 6, 2007 recorded message reporting November 2007 sales, Preston made the following allegedly false and misleading statements:

As we said on our third-quarter earnings call two weeks ago, we are experiencing operational challenges in the new direct distribution center and have taken actions to significantly reduce fourth-quarter sales in order to protect the customer experience.

*There have not been any significant changes in the status of the DCs* since our earnings call. We *continue to focus on maximizing the throughput of the DC for the holiday time period* while at the same time evaluating solutions.

(Doc. 36, Ex. L at 2.) As with the other recorded messages reporting monthly sales, this recording also contained a cautionary statement on forward-looking statements. (*See* Doc. 36, Ex. L at 1.) According to Plaintiff, the highlighted statements, along with the statements made in

19

November, were false or misleading because Defendants did not disclose the full extent of the problems at the distribution center.

In early January 2008, a technology website posted an article indicating that VSD had decided to drop n2N as the developer of its new front-end software system. (Am. Compl. ¶ 86.) Similar articles appeared in other media outlets. According to Plaintiff, these disclosures caused Limited's stock price to plummet over 18% over a six day period. (Am. Compl. ¶ 87.)

During the January 10, 2008 recorded message announcing December 2007 sales, Preston made the following allegedly false statements:

> *We made significant progress with DC output in December and were able to achieve daily output that surpassed our initial expectation.* As a result, we were able to take some actions to regenerate demand, including reactivating a free shipping offer for the semi-annual sale and increasing our email contacts. *We have a thorough understanding of the issues at the DC, and we are working to implement the solution.*

(Am. Compl. ¶ 88.) Plaintiff alleges that as a result of these statements, Limited's stock price rose 2%. (Am. Compl. ¶ 89.)

Finally, in the February 7, 2008 recording announcing January 2008 sales results, Preston made the following allegedly false and misleading statement: "*[w]e continue to make progress on addressing the operational issues related to the direct DC* and are working on implementing the solution." (Am. Compl. ¶ 91.) Again, Plaintiff claims that these statements were false or misleading because they fail to disclose the true extent of the problems being experienced at the distribution center. (*See* Am. Compl. ¶ 92.)

According to Plaintiff, the true impact of the problems with the distribution center was not announced by Limited until it reported its fourth quarter 2007 and full-year results near the end of February 2008. In a press release issued on February 27th, Limited stated the following regarding the outlook for 2008:

The company stated that it now expects February comps in the negative low
double digit range versus its previous guidance for negative mid to high single
digit comps.

The company stated that it expects 2008 first quarter earnings per share to be
$0.05 to $0.10 compared to $0.13 per share last year.

For 2008, the company expects earnings per share of $1.35 to $1.55.

(Doc. 36, Ex. M at 2.)

The next day, Limited held a conference call with analysts to discuss the earnings results.

During this call, Redgrave made the following statements concerning the distribution center and

n2N:

As we look back in 2007, we are clearly disappointed with our financial
performance. We did, however, accomplish much in terms of the execution of our
business strategy. Including the full stabilization of our new supply chain systems
at BBW, the acquisition of La Senza, the sale of the majority of interest in
Express and Limited Stores, the realignment and resizing of our organizational
structure and the resulting reduction in our work force. The recapitalization of our
business resulting in the issuance of an additional $1.25 billion in debt at very
attractive rates and the repurchase of $1.4 billion in shares in 2007. Finally, the
opening of a new distribution center for Victoria's Secret Direct, and I will talk
more about that in a minute.

All of these actions were planned and they are very much part of the new strategic
direction for Limited Brands. They are what we needed to do to set the platform
for growth in our core brands. In addition to all of the changes I have just
mentioned, we also faced a number of challenges in 2007. First of all,
disappointing product launches and a downturn in the environment puts
significant pressure on merchandise margins in the first half of the year as we
work to clear through excess inventory. Year-end inventories, retail inventory, are
down 25% per square foot. Second, it did take us longer than expected to get the
new direct distribution center up to capacity. This resulted in a significant
incremental cost in the last half of the year and forced us to proactively take steps
to reduce demand in the fourth quarter.

. . .

First, with respect to the direct distribution center, we continue to make progress
and we are focusing on two key things. Our primary focus is on the things that
face the customer. Including being able to fully meet the volume demands at our
targeted accuracy levels and offering all expedited shipping options. We are

21

targeting to have all of these issues resolved by the June semi annual sale this year. At the same time, we are focusing on improving our overall efficiency and productivity within the DC. In relation to this effort, we do think it will take a longer period of time before we are completely where we need to be. As a result, in 2008, we will continue to be negatively impacted by higher costs associated with lower accuracy levels running the D.C. and implementing the solutions.

Second, with respect to our technology initiatives. We have made the decision to postpone the implementation of the new supply chain systems at Victoria Secret stores and we are now planning to implement these systems at mast in 2008 and Victoria's Secret in 2009. In addition, in the fourth quarter we and our investment partner in the front end technology venture for Victoria's Secret Direct elected not to provide additional funding and that venture has closed. We are currently evaluating alternative approaches to support the VSD business.

(Doc. 36, Ex. N. at 2.)  As a result of these disclosures, Plaintiff alleges that Limited's stock price fell 15%.  (Am. Compl. ¶ 96.)

Generally, Plaintiff alleges that all of the statements highlighted above concerning the new distribution center and n2N were false and misleading because Defendants failed to disclose the true extent of the problems plaguing both initiatives.  According to Plaintiff, despite Turney's August 2007 claim that the distribution center was experiencing normal implementation issues, the problems were so substantial that a special team had to be put in place to deal with them. (*See* Am. Compl. ¶ 98.)  CW2 and CW6 reported that staff at the distribution center were not adequately trained in using the new systems employed at the center, which were much more complicated that those employed at the old center.  (*See* Am. Compl. ¶¶ 99–100.)  The lack of training, coupled with the complexity of the new system, led to frequent human error in the location and shipment of merchandise ordered by customers.  As a result, "customers often received the wrong products, the wrong quantities, or no items at all."  (Am. Compl. ¶ 101.) Thus, according to Plaintiff, the center was not operating under normal ship times at the times represented by Defendants.

CW4 and CW6 represented that the distribution center was experiencing software glitches throughout the class period, and that these problems were reported to Defendants. (Am. Compl. ¶ 102.) In fact, according to Plaintiff, in the months following the opening of the new distribution center, its daily volume was actually less than that of the old center. (Am. Compl. ¶ 102.) CW1 indicated that daily reports were given to VSD management, including Redgrave, regarding the performance of the distribution center, and that by November 2007, the percentage of erroneous shipments was over 20% to 30%. (Am. Compl. ¶¶ 103–104.) CW4 stated that weekly meetings on the status of the distribution center were held, which were attended by Ruch, who reported to Redgrave and Turney. (Am. Compl. ¶ 105.)

With regard to n2N, Plaintiff essentially alleges that Defendants knew that the software project was destined to fail from the start and yet continued to make laudatory statements about the project during the class period. For instance, Plaintiff alleges that the problems at n2N were largely the result of VSD's failure to provide design specifications to n2N in a timely manner, and the fact that VSD was continually changing the scope of the project. Defendants also allegedly knew that the software was experiencing many problems. According to CW4, by August 2007, it was clear that the system was not going to work. (*See* Am. Compl. ¶ 110.) According to CW6, n2N could not have been operational prior to the end of 2008. (*See* Am. Compl. ¶ 110.) Finally, Plaintiff alleges that by the start of the class period, Defendants had already decided to end the n2N project. In August 2007, a Limited employee is alleged to have told an n2N employee that high-level executives at Limited wanted to "shut down" n2N. (Am. Compl. ¶ 116.) According to CW5, Limited's applications manager and senior database administrator had both expressed doubts about the system as early as December 2006. (Am. Compl. ¶ 116.) Additionally, a draft internal memorandum from September 2007 stated that

"[t]he current working relationship between Limited Brands and n2N [was] not efficient or effective for delivering a solution that [could] be implemented in Limited Brands within an acceptable time frame and budget." (Am. Compl. ¶ 116.)

The amended complaint also has specific allegations concerning Defendants' scienter. First, Plaintiff contends that Defendants knew of the true extent of the problems with n2N and the distribution center through the receipt of various internal reports and through attendance at status meetings. Second, Plaintiff contends that Defendants' motive in orchestrating the scheme to artificially inflate Limited's stock price is evidenced by Limited's April 16, 2007 proxy statement, which indicates that the individual Defendants' incentive compensation was tied to the company's stock price. (Am. Compl. ¶ 129.) Third, according to Plaintiff, the timing of the problems with n2N and the new distribution center, which occurred during the fourth quarter, supports an inference of scienter. In this regard, the fourth quarter is the most important quarter for Limited. Thus, in Plaintiff's view, Defendants had an incentive to conceal problems with n2N and the distribution center so that fourth quarter results would not be affected. (*See* Am. Compl. ¶ 132.)

### IV.

As stated *supra*, Plaintiff brings claims pursuant to Rule 10b-5 and § 20(a) of the Securities Exchange Act of 1934. Defendants move to dismiss the Rule 10b-5 claim on various grounds, including that the allegedly false and misleading statements were not false or material and that Plaintiff has failed to allege facts giving rise to a strong inference of scienter. Defendants move to dismiss the § 20(a) claim on the ground that it is dependent on the Rule 10b-5 claim. As stated *infra*, the amended complaint is dismissed because the Court concludes that Plaintiff has failed to satisfy the requirements of the PSLRA in alleging state of mind. Further,

24

various of the particular statements made by Defendants are either immaterial corporate puffery or protected by the safe harbor afforded forward-looking statements. Additionally, for many of the statements, Plaintiff has failed to adequately plead facts demonstrating their falsity.

## A.

In the Sixth Circuit, a plaintiff may satisfy the scienter requirement of a Rule 10b-5 action by alleging reckless behavior. *See La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010) ("We have held that, following passage of the PSLRA, a plaintiff may plead scienter in a securities fraud complaint by alleging facts that give rise to a strong inference of recklessness."). "Recklessness sufficient to satisfy 10b-5 is 'a mental state apart from negligence and akin to conscious disregard.'" *Id.* (quoting *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 550 (6th Cir. 1999)). It is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir. 1979).

The PSLRA requires that a plaintiff bringing a claim for securities fraud "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The Supreme Court has interpreted this provision to require dismissal of a complaint unless "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). In making this determination, a court must collectively examine all of the facts alleged. *Id.* at 323. In so doing, this Court concludes that the inference of scienter that Plaintiff asks the Court to make is neither cogent, nor as compelling as the competing inferences. Accordingly, Plaintiff's amended complaint must be dismissed.

In *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) (partially abrogated by *Tellabs*),

the Sixth Circuit articulated the following non-exhaustive list of factors relevant to the issue of

scienter:

> (1) insider trading at a suspicious time or in an unusual amount;
> (2) divergence between internal reports and external statements on the same subject;
> (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
> (4) evidence of bribery by a top company official;
> (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
> (6) disregard of the most current factual information before making statements;
> (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;
> (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and
> (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Id.* at 552. Here, Plaintiff alleges a nefarious scheme during the class period by high-level

executives of Limited to conceal problems with the new distribution center and the n2N project.

The alleged motive of the scheme was to artificially inflate Limited's stock price. Plaintiff

contends that a strong inference of scienter arises from the facts that Defendants were aware of

the substantial problems that plagued both n2N and the distribution center, but did not disclose

this information to investors, that the individual Defendants' incentive compensation was tied to

Limited's stock price, providing an incentive to keep that price as high as possible, and that the

events that are the subject of this suit occurred during the critical fourth quarter period.

While the amended complaint may suggest that some of the *Helwig* factors are present in

this case, a review of the totality of the facts and circumstances leads the Court to conclude that

any inference of scienter is simply not plausible, let alone as compelling as the more benign

inferences that are readily drawn. As per the second and sixth factors, the amended complaint

contains allegations that Defendants did not disclose all of the information they had regarding the exact details of the problems with the distribution center. However, any inference of fraud that can be drawn from these allegations is essentially negated by the fact that, from almost the very beginning of the class period, Defendants provided information to their investors concerning the problems at the distribution center. During the August 23, 2007 earnings call, Turney stated that the center was experiencing normal implementation issues, but also emphasized that, at that time, the center was in the midst of a controlled start. During the September 6, 2007 sales call, less than three weeks into the class period, Preston stated that it was taking longer than anticipated to get the center up to full capacity, resulting in shipment delays. Preston also reported that, because of the problems, sales at VSD for August 2007 were down a full 64% from August 2006. Additionally, Preston stated that gross margins were down as a result of added costs caused by problems at the center.

During the November 8, 2007 recorded sales call, Preston made the significant announcement that, because progress in ramping up the distribution center had been slower than expected, the company would be taking action to reduce demand at VSD during the fourth quarter. The November 20th press release concerning third quarter earnings readjusted the projected fourth quarter earnings per share because of the problems at the distribution center. Further, during the conference call discussing the earnings results, Redgrave gave a lengthy statement regarding these problems and the impact they were having on the company, and restated the company's plan to restrict demand at VSD during the fourth quarter. During the call, Turney also discussed how problems at the distribution center had impacted VSD's sales during the third quarter. Finally, in Limited's third quarter form 10-Q, risks associated with the

distribution center were listed as having a potential impact on the company's results. (*See* Doc. 36, Ex. A at 39.)

If, as Plaintiff alleges, Defendants were purposefully concealing the true extent of the problems with the distribution center in order to artificially inflate the stock price, why would they have revealed any of the problems at the distribution center at all? Instead, however, they not only revealed the existence of the problems, but also announced to investors the seemingly drastic plan of reducing demand, and thus sales at VSD, in order to protect customer satisfaction. All of the negative statements concerning the distribution center would have been taken as strong warning signs by any reasonable investor. In this regard, Plaintiff concedes that the fourth quarter was the most important quarter to Limited's success, and the amended complaint alleges that, when the plan to reduce demand was first announced on November 8, 2007, Limited's stock price fell by over 13%. (*See* Am. Compl. ¶ 74.) The 13% drop in stock price is comparable to the 15% drop that occurred when Plaintiff claims that the "truth" was finally revealed in late February 2008. (*See* Am. Compl. ¶ 96.) The fact that the negative statements were made throughout the class period suggests an inference of honest and frank behavior on the part of Defendants, as opposed to an intent to commit fraud and a scheme to inflate the stock price. As per the *Helwig* factors, the Court also notes that the information provided to investors about the distribution center was not necessarily inconsistent with the alleged internal information, just less detailed than Plaintiff apparently would have liked.

Next, the amended complaint alleges that

> Defendants' motive and opportunity also support an inference of scienter. According to Limited Brands' April 16, 2007 Proxy Statement, defendants' received substantial incentive compensation (*i.e.*, bonuses) based, in part, on Limited Brands' stock price. Thus, defendants were incentivized to inflate the Company's stock price in order to receive larger bonuses for themselves.

(Am. Compl. ¶ 129.)  However, even if this allegation is true, courts have rejected the assertion

that an inference of fraudulent intent can be drawn from the mere fact that an executive is given

an incentive to ensure that his or her corporation succeeds. *See, e.g., PR Diamonds, Inc. v.*

*Chandler*, 364 F.3d 671, 690 (6th Cir. 2004) ("All corporate managers share a desire for their

companies to appear successful. That desire does not comprise a motive for fraud. . . . Neither

does an executive's desire to protect his position within a company or increase his

compensation." (citations omitted)).  Further, any inference of fraud that could be drawn based

on the motive of Defendants to keep the stock price high, and thus increase their own

compensation, is effectively negated by the fact that, as explained above, they were releasing

negative information about the distribution center throughout the class period that possibly

resulted in substantial declines in Limited's stock price.

As noted by Defendants, conspicuously absent from this case are any allegations of

insider stock sell-offs, ancillary lawsuits, or investigations. *See id.* at 691 (while not dispositive,

"the absence of inside sales dulls allegations of fraudulent motive").  Rather, public filings

submitted by Defendant indicate that during the class period, all of the Defendants, including

Limited itself, purchased shares of Limited Stock. (*See* Doc. 36, Exs. J, Q, R, S, T.)  These

purchases undermine any inference of scienter.  Also absent from the amended complaint are any

allegations that, after the allegedly fraudulent scheme was consummated, Limited later restated

or amended its financial statements concerning the period in question.  This begs the question: if

Defendants' goal was to artificially inflate Limited's stock price, what would be the point of

concealing the problems at the distribution center and with the n2N project, but then still

accurately reporting sales and financial results—results that were clearly being impacted by the

problems with the initiatives?

With regard to the n2N project, Plaintiff alleges that fraud was committed because Defendants knew that the software system was doomed to failure from the very beginning and then misled investors by painting a rosy picture of an actually hopeless situation.  In Part IV.B.2 *infra*, the Court concludes that Plaintiff has failed to sufficiently allege that the n2N project was ever material to the prospects of Limited.  However, even if materiality were present, any inference of fraud with regard to n2N is negated by the fact that, as late as November 2007, Limited contributed an additional $7.5 million to the project in addition to its original $10.6 million investment.  (*See* Am. Compl. Ex. B at 4.)

**B.**

The Court further holds that a sizable portion of the allegedly false or misleading statements identified by Plaintiff are not actionable as Plaintiff has failed to adduce facts demonstrating their falsity.  Additionally, many of the other statements are best characterized as corporate "puffery" or are otherwise protected by the PSLRA's safe harbor for forward-looking statements.

"To state a claim under § 10(b) or Rule 10b-5, Plaintiffs must allege that Defendants made a misrepresentation or omission of material fact that Defendant had a duty to disclose." *Ley v. Visteon Corp.*, 543 F.3d 801, 807 (6th Cir. 2008).  An omission of fact is material if there is a "'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  "When a company chooses to speak, it must 'provide complete and non-misleading information.'" *Ind. State Dist. Council of Laborers and*

30

*Hod Carriers Pension and Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 943 (6th Cir. 2009)

(quoting *Rubin v. Schottenstein, Zox, and Dunn*, 143 F.3d 263, 268 (6th Cir. 1998)).

Statements that constitute mere corporate puffery are not considered to be material. In

this regard, "[c]ourts have consistently found immaterial a certain kind of rosy affirmation

commonly heard from corporate managers and numbingly familiar to the marketplace—loosely

optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the

opinions of the speaker, that no reasonable investor could find them important." *Id.* at 944

(internal quotation omitted).

Additionally, the PSLRA established a safe harbor for forward-looking statements in

certain instances. *See* 15 U.S.C. § 78u-5. The PSLRA defines "forward-looking statement" to

include:

> **(A)** a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> **(B)** a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> **(C)** a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
>
> **(D)** any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C) . . . .

*Id.* § 78u-5(i)(1). The Sixth Circuit has held that a plaintiff may overcome the safe-harbor

protection for forward-looking statements "only if the statement was material; if defendants had

actual knowledge that it was false or misleading; and if the statement was not identified as

'forward-looking' or lacked meaningful cautionary statements." *Helwig*, 251 F.3d at 548. "[I]f

the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary

language, a defendant's statement is protected regardless of the actual state of mind." *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003). Finally, pursuant to the PSLRA, oral forward-looking statements may satisfy the safe-harbor provisions by referring to a company's SEC filings. *See* 15 U.S.C. § 78u-5(c)(2)–(3).

1.

A review of the amended complaint and the documents of which the Court may take judicial notice, reveals that many of the statements alleged by Plaintiff to be false or misleading are either immaterial puffery, not accompanied by additional facts indicating why the statements were false, or protected by the safe harbor for forwarding-looking statements.

Turning first to the August 22, 2007 press release, the allegedly false statements therein are clearly forward-looking and accompanied by meaningful cautionary statements. The statements in question assert Limited's comfort with the then-current estimates of its earnings per share in the third and fourth quarters. These statements are forward-looking in that they contain "a projection of . . . earnings (including earnings loss) per share." *Id.* § 78u-5(i)(1)(A). Additionally, as quoted in Part III *supra*, the press release contains an extremely detailed statement of the risks that might impact any earnings projections. The Court disagrees with Plaintiff's assertion that the cautionary language found in the press release was mere boilerplate. Rather, a review of this language reveals that it identifies rather specific risks associated with the retail and fashion industries. As Defendants have pointed out, they were "not required to detail every facet or extent of [the] risk[s] to have adequately disclosed the nature of the risk[s]." *Miller*, 346 F.3d at 678.

Similarly, most of the identified statements made during the August 23rd earnings conference call are either unaccompanied by sufficient allegations of their falsity, or are forward-

32

looking. During this call, Redgrave and Turney both described the opening of the new, 1-million-square-foot distribution center that was intended to support the growth of VSD, and which had a capacity over 40% greater than the old distribution center. Plaintiff does not allege that the new center never opened or did not actually exist, or anything to indicate that the intended capacity was not 40% greater than the old distribution center. Other statements, such as Burgdoerfer's repeat of the press release's indication that they were comfortable with the predicted earnings per share for the third and fourth quarters, and Turney's statement that the investments undertaken by the company would support future growth of VSD are forward-looking, or, in the case of the statement about future growth, puffery. At the start of the call, Katzenmeyer reminded listeners that forward-looking statements made during the call were subject to the risks identified in Limited's SEC filings. A review of these filings reveals ample and sufficient cautionary language. For example, a review of pages four through eight of Limited's 2006 annual report,[4] filed on SEC form 10-K, indicates even more detailed cautionary language than the August 22nd press release. Thus forward-looking statements made during the August 23rd conference call are protected by the safe-harbor provision.

Additionally, all the statements allegedly made in the September 5, 2007 presentation are either unsupported by allegations of their falsity or are mere puffery. These statements include that the n2N and distribution center projects would provide "significant growth opportunities," that a new distribution center had just opened, and that major technology initiatives were underway. The statement regarding growth is clearly of the type of subjective, optimistic fluff deemed to be immaterial puffery. As to the other two statements, as stated above, Plaintiff has not alleged that the distribution center never opened or never existed, nor did Plaintiff provide

---

[4] Available at http://www.sec.gov/Archives/edgar/data/701985/000119312507073368/d10k.htm#toc.

any allegations to indicate that the statement concerning major technology initiatives was not true.

The statement made in the September 6th sales results recording that the company anticipated that normal ship times would be in place at the distribution center by the end of September and predicting an increase in September sales is also forward-looking. This statement contains a prediction of future financial performance, and components of the statement underlie the assumptions on which the prediction is based. As with the August 23rd call, the substantial cautionary language included in Limited's SEC filings was incorporated into the call by Preston.

Turning to n2N's September 17th press release, which stated that VSD's substantial business would within a few months be operating on n2N's software platform, Plaintiff has failed to allege how the statement by a separate corporate entity should be attributed to Defendants. Despite allegations that Redgrave and Turney were on n2N's board of directors, and that Limited had a controlling interest in n2N, Plaintiff has not specifically alleged that Defendants themselves ordered or in any way were involved with the issuance of the September 17th press release. Accordingly, the statement contained therein cannot be attributed to Defendants.

Turney's statement in the October issue of Apparel Magazine that "[o]verall, we're very excited about the implementation [of n2N]. It's going to add a lot of value to our business. We're very dedicated to it. We've got a lot of people focused on it, and I think it is going to set us up for growth for the future" is puffery, as it presents subjective, vague, and optimistic prospects for the future. The Court also notes that Turney's alleged statement during this interview that n2N would allow VSD to double its sales in five years is forward-looking, but unprotected by cautionary language.

As with similar statements identified above, Preston's statement in the October 11th sales results recording that VSD transitioned to a new distribution center in August is not false, despite the fact that Plaintiff has identified it as false or misleading. As for Wexner's presentation on October 16th, his statements about the company being drastically better planned for the holiday than in previous years and being better disciplined, along with his statement about conservative planning and his confidence and ease going into the holiday season represent his subjective, rosy opinion about the company's future prospects and are thus puffery.

Plaintiff alleges that, during a presentation to the annual Consumer Focus Forum on October 25, 2007, Preston and Katzenmeyer falsely stated that Limited was targeting over 12% growth in earnings per share. However, Plaintiff has failed to allege how or why this statement was false. In this regard, there is no allegation that the company actually was not trying to target that type of growth rate. Accordingly, as with the statements discussed above, this statement also does not meet the pleading requirements of the PSLRA.

In several paragraphs of the amended complaint, Plaintiff alleges that, in November 2007, Defendants made statements that demand for Victoria's Secret direct products remained strong. Similar statements were made by Preston during the November 8, 2007 sales results recording, and by Turney and Redgrave during the November 20th earnings call. However, despite the fact that Plaintiff alleges that these statements were false and misleading, no specific allegations support this contention. Moreover, it is unclear how issues related to demand for VSD's products is relevant to Defendants' purported scheme to conceal problems on the distribution side of their VSD business.

Furthermore, the falsity of several other statements made during the November 20th call is not supported by sufficient allegations in the amended complaint. During the call, Turney and

Redgrave both stated that solving the problems at the distribution center was the company's "most significant operational priority." However, no allegations in the amended complaint specifically suggest that this was not the case. During the call, Redgrave also stated that they were reevaluating the approach and timing of the front-end technology systems at VSD and also made a statement about the importance of distinguishing between the separate VSD and Victoria's Secret stores lines of business. As with many of the other "false" statements identified in the amended complaint, the fraudulent nature of these statements is not specifically explained by other allegations, nor readily apparent.

Other statements made by Turney and Redgrave during the November 20th call also can best be considered either puffery or to fall within the safe-harbor provision for forward-looking statements. Redgrave's statement that the company was "very strong and that we are very well positioned" is clearly puffery. Turney's statements about ramping up the distribution center for spring and Redgrave's statement about being able to handle spring volume are both forward-looking as they deal with predictions concerning future business operations. These statements were prefaced by the adequate cautionary language found in Limited's SEC filings, which were referred to by Katzenmeyer at the start of the call. Furthermore, risk associated with VSD's new distribution center was specifically mentioned in Limited's third quarter form 10-Q. (*See* Doc. 36, Ex. A at 39.)

Finally, as to the allegedly false statements in the December 6, 2007 sales results recording, the amended complaint does not provide sufficient supporting allegations concerning the falsity of the statements. The statements include that there had not been any significant changes in the status of the distribution center and that the company was focused on maximizing the throughput of the distribution center. The amended complaint does not allege that the

36

company was not focusing on maximizing throughput or that some significant setback specifically occurred between the November 20th call and the December 6th recording.

**2.**

The Court also holds that Plaintiff has failed to sufficiently plead that any of the statements not specifically disregarded in Part IV.B.1 *supra*, concerning n2N were material. The only remaining "actionable" statements specifically concerning the n2N project were those made by Turney in the published magazine interview in October 2007. These include her statement that she hoped n2N's software would held double VSD's sales within five years, and that the software only had "normal glitches" but nothing major. However, despite identifying these forward-looking and optimistic statements concerning Turney's hopes with regard to the new, front-end software system, and despite Plaintiff's own vague allegations that n2N's prospects were contributing to Limited's forecasts of future earnings per share, Plaintiff has failed to allege that the failure of the n2N project had any impact whatsoever on the sales or profits of Limited. Despite Plaintiff's contention that Limited stock's 18% decline over a six day period in early January 2008 was caused by the announcement that n2N was being closed, Defendants have demonstrated that several of Limited's competitors in the retail segment also suffered sharp declines in their stock prices during that same short period. (*See* Doc. 36, Ex. X.)  *See also Beaver Cnty. Ret. Bd. v. LCA-Vision Inc.*, No. 1:07-CV-750, 2009 WL 806714, at *5 (S.D. Ohio Mar. 25, 2009) (a court may take judicial notice of well-publicized stock prices without converting a motion to dismiss into one for summary judgment).  The Court also notes that Limited's income statement issued in the February 27, 2008 press release indicates that in 2007, the company's sales totaled over $10 billion dollars, with profits exceeding $700 million (Doc. 36, Ex. M at 6).  The Plaintiff has not plausibly pleaded a scenario in which a failed $18 million

investment in a software system was material to the economic condition of a company the size of Limited.

## V.

Count 2 of the amended complaint alleges that the individual Defendants should be liable as controlling persons pursuant to § 20(a) of the Securities Exchange Act. However, as this count is contingent on the success of Count 1, it must also be dismissed for failing to state a claim.

## VI.

### A.

In conclusion, the most plausible inference to be derived from the totality of the facts in this case is as follows: during the class period, two initiatives, the n2N project and the opening of the new distribution center, were underway at VSD. Defendants were optimistic that the n2N project would help to enhance sales on the "front-end" of VSD's business model and were equally optimistic that the new distribution center would reduce costs at the back-end. Despite this optimism, the initiatives encountered difficulties. The distribution center was plagued by problems in accurately processing orders, resulting in lost sales and profits. Similarly, the n2N venture was unable to successfully develop and deliver the new front-end software system, and Defendants decided to end the project. As to the problems with the distribution center, Defendants provided adequate information to their investors, and even publically announced a plan to reduce sales during the fourth quarter so as to protect customer satisfaction. As to the n2N project, there was no evidence that its failure had any impact on Limited's financial results.

No inference of fraudulent or reckless intent can be drawn from the facts that is nearly as compelling as the above. In this lawsuit, however, Plaintiff attempts to turn what at worst can be

characterized as ordinary business setbacks into a class action for securities fraud. "Because the [PSLRA] forbids such alchemy," *Indiana State District Council of Laborers*, 583 F.3d at 938, this action is dismissed.

**B.**

For the foregoing reasons, Defendants' Motion to Dismiss the Amended Class Action Complaint with Prejudice (Doc. 36) is **GRANTED**. This action is dismissed with prejudice, and the Clerk is directed to enter judgment in favor of Defendants and close this matter.

**IT IS SO ORDERED.**

3-29-2011
_____
**DATED**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**